UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE EVERGREEN ULTRA SHORT OPPORTUNITIES FUND SECURITIES LITIGATION | ) ) ) ) ) | No. 1:08-CV-11064-NMG  <u>CLASS ACTION</u> |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Court-appointed Lead Plaintiffs, the Evergreen Investor Group[1] and the Bricklayers Group[2] (collectively, "Plaintiffs"), make the following allegations, except as to allegations specifically pertaining to Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Plaintiffs' counsel, which included analysis of publicly available news articles and reports, public filings with the Securities and Exchange Commission ("SEC"), securities analysts' reports and advisories, interviews, expert consultation, and articles, research reports and related information pertaining to the residential and commercial mortgage industry.

## I.      NATURE OF THE ACTION

1.       This is a federal securities class action brought on behalf of all persons or entities who purchased or acquired shares of the Evergreen Ultra Short Opportunities Fund (the "Fund") from Evergreen Fixed Income Trust (the "Evergreen Trust" or the "Company") between October 28, 2005 and June 18, 2008 (the "Class Period") (the "Class") seeking to pursue remedies under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l, and 77o.

2.       Plaintiffs allege that Defendants violated federal law in registering, marketing and selling the Fund as a stable, "ultrashort" bond fund that provides "current income consistent with preservation of capital and low principal fluctuation."  In fact, the Fund was not an ultrashort bond fund, let alone one that preserved capital and maintained low principal fluctuation, because it was

---

[1]       The Evergreen Investor Group is comprised of International Brotherhood of Electrical Workers Local 98, NECA Electrical Workers Joint Apprenticeship Training Trust Fund and First Agency Account LP.

[2]       The Bricklayers Group is comprised of the Bricklayers and Allied Graftworkers Local 1 of PA/DE Health and Welfare Fund and the Bricklayers Local 54 of Pennsylvania Supplemental Welfare Fund.

comprised of assets that were illiquid and not truly short-term in nature and otherwise riskier than represented.  In addition, the Fund's holdings were routinely mispriced, obscuring their true value. Eventually, the true risks presented by the Fund's assets came to light, resulting in staggering losses to Fund investors.

3.      Specifically, the Fund's Registration Statement and Prospectus materials[3] made fundamental and core representations to investors that the Fund was safe and subject to minimal or nominal price fluctuations.  These misrepresentations included, *inter alia*:

- "The Fund seeks to provide current income consistent with preservation of capital and low principal fluctuation."

- The "Fund intends to maintain an average portfolio duration of approximately one year or less."

- The Fund's investment "strategy is to seek the highest total return by maximizing income and minimizing price fluctuations…"

- "The Fund seeks to provide investors with a high level of current income while reducing price volatility."

- The Fund's performance was benchmarked to the Lehman 6-Month Treasury Bill Index and the Lehman Brothers Government/Credit 0-2.5 Year Index.

- "The Fund may not invest more than 15% (10% for money market funds) of its net assets in securities that are illiquid."

- The valuation of the Fund's Net Asset Value ("NAV").

---

[3]      References to Registration Statements and Prospectuses are defined in paragraphs ¶¶93-95. The Registration Statements, Prospectuses and supplements to the SEC filings, and other incorporated documents, are referred to, collectively, as the "Offering Materials."

4.      These core representations portrayed the Fund as a safe, liquid and stable investment suitable for conservative investors.  In reality, however:

- The Fund's investments were inconsistent with an ultrashort bond fund.  The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund."  Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation."

- The Fund's average duration exceeded one year.  The Fund repeatedly represented that it intended to "maintain an average portfolio duration of approximately one year or less."  This representation regarding the Fund's average portfolio duration was critical, as it indicated the Fund's sensitivity to changes in interest rates.  Duration is the measure of a security's price sensitivity to changes in interest rates; the lower the duration, the lower the interest rate risk and price volatility.  An average duration of one year means that the average price of the security will decline only 1% for each percentage increase in interest rates.  Generally, ultra short-term bond portfolios have average durations of less than one year.  Thus, a fund with average portfolio duration of approximately one year or less is relatively immune from interest rate changes and enjoys minimal price fluctuations.  These characteristics make ultra short-term bond funds attractive to conservative investors.  The actual duration of the securities held by the Fund, as calculated for Plaintiffs by a sophisticated industry expert, exceeded two years throughout most of the Class Period.  This means that the Fund's price was much more volatile and sensitive to changes in interest rates than represented in the Offering Materials and compared to other ultra short bond funds.

- The Fund was not comparable to similarly titled funds.  The Fund's performance was not comparable to the Lehman 6-Month Treasury Bill Index or the Lehman Brothers Government/Credit 0-2.5 Year Index because the average duration of the Fund's portfolio exceeded two years throughout most of the Class Period, significantly higher than the durations associated with these indices.  The Fund's portfolio had far greater interest rate, credit and liquidity risks than the bond funds appropriately compared to these indices.

- The Fund's investments were increasingly illiquid.  An increasingly substantial percentage of the Fund was invested in speculative, illiquid, private placement structured finance securities, which were incompatible with a short-term bond fund and inconsistent with the Fund's representation that it would not invest more than 15% of its net assets in illiquid securities.

3

For example, as calculated by Plaintiffs, in 2005, 26.67% of the Fund's Net Assets were in private placement holdings. By 2008, over 50% of the Fund's Net Assets were in private placement holdings. Thus, over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy.

- <u>The Fund invested in riskier than represented mortgage-backed securities</u>. The asset allocation of the Fund was inconsistent with Defendants' representation that the Fund was managed to minimize price fluctuations. For example, many of the Fund's assets were invested in risky and volatile mortgage-backed securities ("MBSs"). Such a high concentration of securities in one asset class is wholly inconsistent with the represented classification of the Fund as an "ultra short bond fund" designed to minimize "price fluctuations." Moreover, the Fund's longer than advertised duration indicates that the price of the Fund was actually highly volatile and sensitive to changes in interest rates.

- <u>The Fund's NAV was overstated</u>. Throughout the Class Period, a substantial proportion of the assets held by the Fund were essentially illiquid and should have been priced substantially lower than stated. An accurate valuation of the NAV would have been significantly lower than the represented NAV during the Class Period. As a result, Defendants' valuation of the Fund's NAV was overstated.

5.      As a result, Defendants' public statements regarding the purpose or objective of the Fund and/or the safety features of the Fund were materially false and misleading, omitted essential facts that made the statements misleading or that were required in order to render the statements non-misleading, and/or omitted material facts required to be stated therein because the Fund had invested heavily in illiquid, volatile, longer-duration, and risky securities.

6.      The Fund continued investing in securities and assets that were at odds with the Fund's stated investment strategies even as news accounts described severe troubles in the mortgage and credit markets. To be sure, the Fund's heavy investments in MBSs, as detailed below, many of which were backed by subprime mortgages, attached the fate of the Fund to the housing and sub-prime mortgage markets.

4

7.     Then, beginning in late 2006 and into 2007, as described in greater detail herein, there was a severe downturn in the housing and subprime mortgage markets, which caused the value of mortgages to decline and increased the price volatility of MBSs.  The downturn also rendered many MBSs illiquid and speculative, which Defendants themselves ultimately acknowledged in their semi-annual report for the period ending December 31, 2007.   Yet, at the same time, Defendants continued to reassure investors of the safety of their investments:

> We are pleased to provide the Semiannual Report for Evergreen Ultra Short Opportunities Fund for the six-month period ended December 31, 2007.
>
> *     *     *
>
> Over the six-month period, the management teams of Evergreen's short- and intermediate-term bond funds pursued strategies based on each fund's objective.  The team managing Evergreen Short Intermediate Bond Fund, for example, focused on the higher-quality tiers of the markets while keeping duration — or price sensitivity to changes in interest rates — close to neutral to the market. At the same time, managers of Evergreen Adjustable Rate Fund continued to emphasize AAA-rated adjustable rate mortgages with relatively stable cash flows. ***The team supervising Evergreen Ultra Short Opportunities Fund, meanwhile, maintained a portfolio of shorter-maturity, higher-quality securities.***  Managers of Evergreen Institutional Enhanced Income Fund maintained a conservative strategy designed to seek a higher yield than a money market fund with only minimal price variability.
>
> We believe the experiences in the investment markets during the past six months have underscored the value of a well-diversified, long-term investment strategy to help soften the effects of volatility in any one market or asset class. As always, we encourage investors to maintain diversified investment portfolios in pursuit of their long-term investment goals.

(Emphasis added).

8.     Throughout the Class Period, and propped up by Defendants' pubic statements and reported NAV, the Fund traded in a stable range from $9-$10 per share.  Then, on June 19, 2008, the Evergreen Trust announced that the Fund would be liquidated with shareholders of record as of June 18, 2008 receiving a cash distribution based on a $7.48 per share NAV, calculated after the close of

business on June 18, 2008.  The amount paid to shareholders of the Fund in the liquidation was significantly lower than the value of the Fund's shares during the Class Period.  Indeed, only seven business days earlier, on June 9, 2008, the Fund's shares were offered at $9.07 per share.  As a result, Plaintiffs and the members of the Class have suffered considerable damages.

9.      After the close of the Class Period, and after announcing the closure and liquidation of the Fund, Defendants revealed that *all* of the Fund's investments held of March 31, 2008 were illiquid.  Despite this ultimate admission, on March 31, 2008, Defendants claimed the Fund held just $84.2 million of illiquid assets, or 11.5% of the NAV.  The illiquidity of the Fund's investments led directly to a sharp decrease in the Fund's NAV over the six months ended September 30, 2008 of approximately $168 million, and fully revealed the extent of the Fund's volatile, risky, and illiquid holdings.

10.     As a result, by the time Defendants liquidated the Fund and revealed the Fund's true investment strategy and NAV valuation, Plaintiffs had incurred hundreds of millions of dollars in losses.  To be sure, shareholders of the Fund lost more than 24% of their supposedly safe and liquid investments.  Moreover, the full amount of the losses cannot be calculated without the Fund's delinquent fiscal year-end financial statement for the period ending June 30, 2008, which has yet to be filed with the SEC.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 11, 12 and 15 of the Securities Act, 15 U.S.C §§77k, 77i and 77o.

12.     This Court has jurisdiction over the subject matter of this action pursuant to §22 of the Securities Act (15 U.S.C. §77v(a)) and 28 U.S.C. §1331.

13.     Venue is proper in this District pursuant to §22(a) of the Securities Act, 15 U.S.C §77v(a), and 28 U.S.C §1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of the false and misleading Registration Statements and Prospectuses defined in ¶¶93-95, used to sell the Fund's shares, occurred in substantial part in this District. Additionally, the principal place of business of Defendants is within this District.

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.     Plaintiffs

15.     Plaintiff International Brotherhood of Electrical Workers Local 98, an institutional investor appointed lead plaintiff by the Court in an order dated February 27, 2009, purchased shares of the Fund pursuant to and/or traceable to the Offering Materials and has been damaged thereby.

16.     Plaintiff NECA Electrical Workers Joint Apprenticeship Training Trust Fund, an institutional investor appointed lead plaintiff by the Court in an order dated February 27, 2009, purchased shares of the Fund pursuant to and/or traceable to the Offering Materials and has been damaged thereby.

17.     Plaintiff First Agency Account LP, an institutional investor appointed lead plaintiff by the Court in an order dated February 27, 2009, purchased shares of the Fund pursuant to and/or traceable to the Offering Materials and has been damaged thereby.

18.     Plaintiff Bricklayers and Allied Graftworkers Local 1 of PA/DE Health and Welfare Fund, an institutional investor appointed lead plaintiff by the Court in an order dated February 27, 2009, purchased shares of the Fund pursuant to and/or traceable to the Offering Materials and has been damaged thereby.

19.     Plaintiff Bricklayers Local 54 of Pennsylvania Supplemental Welfare Fund, an institutional investor appointed lead plaintiff by the Court in an order dated February 27, 2009, purchased shares of the Fund pursuant to and/or traceable to the Offering Materials and has been damaged thereby.

**B.     Defendants**

20.     Defendant Evergreen Trust is a Delaware organized entity that has its principal place of business at 200 Berkeley Street, Boston, Massachusetts.  It is the issuer of the shares of the Fund purchased by Plaintiffs and the members of the Class.

21.     Defendant Evergreen Investment Management Company, LLC ("Evergreen Investment") is the investment advisor of the Fund.  At the time the wrongdoing occurred, it was a wholly owned subsidiary of Defendant Wachovia Corporation ("Wachovia").

22.     Defendant Evergreen Investment Services, Inc. ("Evergreen Services") was the underwriter and distributor of the shares of the Fund sold by Evergreen Trust.  Evergreen Services marketed the Fund through broker-dealers and others primarily affiliated with Wachovia.  The principal place of business of Evergreen Investment and Evergreen Services is 200 Berkeley Street, Boston, Massachusetts.

23.     During the Class Period, Defendant Wachovia was a diversified financial services company and one of the largest such providers in the United States.  It had retail and commercial

banking operations in 21 states and nationwide retail brokerage, mortgage lending and auto finance businesses and was headquartered at 301 South College Street, Suite 4000, One Wachovia Center, Charlotte, North Carolina.

24.     Defendant Dennis H. Ferro ("Ferro") has been, at all relevant times, the President and Chief Executive Office of Evergreen Investments and the Principal Executive Officer of Evergreen Trust.  Ferro signed the Registration Statements and other SEC filings issued by Evergreen Trust during the Class Period, which are alleged herein to be materially false or misleading.

25.     Defendants Kasey Phillips ("Phillips") has been the Principal Financial Officer of Evergreen Trust throughout the relevant time period.  Phillips signed the Registration Statements and other SEC filings issued by Evergreen Trust during the Class Period, which are alleged herein to be materially false or misleading.

26.     Defendant Charles A. Austin III ("Austin") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Austin signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

27.     Defendant Shirley L. Fulton ("Fulton") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Fulton signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

28.     Defendant K. Dun Gifford ("Gifford") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Gifford signed the Registration Statements issued by

Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

29.     Defendant Leroy Keith, Jr. ("Keith") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Keith signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

30.     Defendant Gerald M. McDonnell ("McDonnell") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  McDonnell signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

31.     Defendant Patricia B. Norris ("Norris") has been a member of the Evergreen Board of Trustees since 2006.  Norris signed various Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

32.     Defendant William Walt Pettit ("Pettit") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Petit signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

33.     Defendant David M. Richardson ("Richardson") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Richardson signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

34.     Defendant Russell A. Salton III ("Salton") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Salton signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

35.     Defendant Michael S. Scofield ("Scofield") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Scofield signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

36.     Defendant Richard J. Shima ("Shima") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Shima signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

37.     Defendant Richard K. Wagoner ("Wagoner") has been a member of the Evergreen Board of Trustees throughout the relevant time period.  Wagoner signed the Registration Statements issued by Evergreen Trust and filed with the SEC during the Class Period, which are alleged herein to be materially false or misleading.

38.     Defendants listed in ¶¶24-37 are referred to herein, at times, as the "Individual Defendants."

39.     Each of the Individual Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained in the documents filed by the Company with the SEC in connection with the offerings.  Because of their Board memberships, and

11

executive and managerial positions, each of the Individual Defendants was responsible for ensuring the truth and accuracy of the various statements contained in the Company's Offering Materials.

40.     The Individual Defendants, because of their management positions and membership on Evergreen's Board of Trustees, had the power and influence to direct the management and activities of Fund and its employees.  Accordingly, the Individual Defendants were able to, and did, control the contents of the Offering Materials complained of herein.  Each Defendant that was a signatory to the Offering Materials was provided copies of the untrue and misleading Offering Materials prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

41.     All of the defendants listed in ¶¶20-37 are sometimes collectively referred to herein as "Defendants."

## IV.     CLASS ACTION ALLEGATIONS

42.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class, as defined above.  Excluded from the Class are Defendants, members of the immediate family of the Individual Defendants, any subsidiary or affiliate of Defendants, and the directors, officers and employees of Defendants or their subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States.  Record owners, beneficial owners, and

other members of the Class may be identified from records maintained by Defendants, the Fund, or the Fund's transfer agent, Evergreen Service Company, LLC. Class members may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class action litigation.

44.     Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' conduct in violation of federal law that is complained of herein.

45.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law or fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law or fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts and omissions as alleged herein;

(b)     Whether the Offering Materials issued by Defendants to the investing public were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not misleading and were not prepared in accordance with the rules and regulations governing their preparation; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy and common questions of law and fact predominate over individual

questions.  Because the joinder of all individual claim members is impracticable and the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a class action.

## V.  VIOLATIONS OF THE SECURITIES ACT

48.     In the allegations and claims set forth herein, Plaintiffs assert strict liability claims pursuant to the Securities Act on behalf of themselves and the Class.  Plaintiffs' claims are not based on any allegations of intentional, knowing, or reckless misconduct on behalf of any of the Defendants.  Plaintiffs' claims do not allege fraud and do not sound in fraud.

## VI.  SUBSTANTIVE ALLEGATIONS

### A.     The Fund

#### 1.     The Creation of the Fund

49.     Evergreen Investments announced the formation of the Fund on July 14, 2003.  In its press release announcing the Fund's creation, the Company stated:

> "As the Fed continues to cut interest rates, investors may be looking for ways to broaden their fixed income allocation and mitigate interest rate risk while seeking to produce a relatively attractive yield," said Dennis Ferro, President and Chief Investment Officer of Evergreen Investments.  "I believe Evergreen Ultra Short Bond Fund provides an attractive investment vehicle for those clients willing to take a few steps up the risk spectrum to possibly increase yield."

> Portfolio manager Lisa Brown Premo, Managing Director of Evergreen's Mortgage-Backed Securities and Structured Products Group, leads the Ultra Short Bond Fund team, along with co-manager Robert Rowe.  Together they have combined investment experience totaling nearly 30 years, including management of the complementary product offering, Evergreen Adjustable Rate Fund.

> Ferro continued, "We believe this type of fund makes a great deal of sense today because ultra short bond funds  have maintained a relatively stable share price in a

variety of interest rate environments and they have outpaced the yield currently offered on alternative short-term investments, such as money market funds.

50.     The Fund was an open-ended mutual fund with its shares offered on a continuous basis to the public pursuant to the Offering Materials filed with the SEC.  The Fund issued four classes of shares, trading on NASDAQ: EUBAX, EUBBX, EUBCX, EUBIX, with the reported price for each class of shares reflecting the Fund's reported NAV.

51.     The Fund described itself as "a diversified series of Evergreen Fixed Income Trust." The Fund was named the Ultra Short Bond Fund until August 1, 2005, when it began to be referred to as the Ultra Short Opportunities Fund.  On June 14, 2007, the Fund merged with the Evergreen Limited Duration Fund, but maintained its name as the Ultra Short Opportunities Fund.

## 2.     The Fund's Investment Strategy

52.     Throughout the Class Period, Defendants actively marketed the Fund to investors as a higher-yielding alternative to money-market funds, offering a combination of safety and liquidity – "to provide current income consistent with preservation of capital and low principal fluctuation."  As described in the Offering Materials, the Fund's basic strategy was "to seek the highest total return by maximizing income and minimizing price fluctuations."  The Offering Materials touted the Fund's ultra short duration strategy as "maintain[ing] an average portfolio duration of approximately one year or less," thus keeping price volatility low.  Consistent with these goals, and its relatively stable NAV, investors poured significant sums into the Fund.  To be sure, the Fund grew from $41 million in net assets as of June 30, 2003 to $731 million in net assets as of March 30, 2008, the last published reporting period.

53.     Despite these representations, throughout the Class Period the Fund invested in illiquid, risky, speculative and volatile securities.  As a result of these risky investments, which were

15

stood in stark contrast with the Fund's stated investment strategy, a substantial proportion of the Fund's investments were illiquid, and the actual valuation of the Fund's NAV was substantially below the Fund's stated valuation.

### 3. The Fund's Average Duration Exceeded the Public Representations

54.     Specifically, an expert analysis of the Fund's average portfolio duration, based on publicly available information, indicates that throughout the Class Period actual average duration exceeded one year.  An analysis was undertaken of the Fund's holdings for the years ended March 31 for 2005, 2006, 2007, and 2008.  The analysis was performed using a subset of securities representing about a quarter of the total Fund net asset value.  These securities were selected because they were publicly traded, as opposed to much of the remainder of the Fund's investments which, as set forth in greater detail below, were 144A private placements.  As of March 31, 2005, the Fund had an average duration of over 6 years.  As of March 31, 2006, the Fund had an average duration of approximately 5.3 years.  As of March 31, 2007, the duration was over 5.4 years while the Fund's average duration was 5.30 years as of March 31, 2008, far in excess of the Fund's stated average duration of one year or less.

55.     Even assuming that the remainder of the Fund's securities, which were private placements and thus unavailable for review absent discovery, had duration equal to one year, the weighted average modified duration would have been over 2 years throughout the Class Period. This estimate is highly conservative, particularly given the illiquid nature of the private placements that made up much of the rest of the Fund's investments at the time.  In any event, the Fund's actual average duration greatly exceeded its stated investment objectives.

56.     The duration of the Fund was critically important to investors because duration is a fundamental measure of risk for a portfolio of debt instruments.  Duration measures the volatility of bond prices as a result of unanticipated interest rate fluctuations.  All else being equal, the longer the duration, the greater the bond's price volatility and the greater its interest rate risk exposure.  Thus, when interest rates increase unexpectedly, the price of a longer duration bond will tend to fall by more than the price of a shorter duration bond.

57.     The objective specified in the Fund's Offering Materials stated that the Fund would be managed so as to limit risk, in part, by controlling the duration of the portfolio investments.  By exceeding its own duration objectives, and investing in high duration securities, the Fund managers took on excessive risk that was not disclosed to Fund shareholders.

### 4.      The Fund Was Significantly More Illiquid Than Represented

58.     In addition, the Fund's investments were more illiquid than represented.  From the beginning of the Class Period, a substantial percentage of the Fund's assets were invested in illiquid, highly speculative, and risky private placement securities.

59.     Private placement securities are sold via private placement offerings.  A private placement offering, and subsequent sale, involves the raising of capital via private rather than public placement under SEC Rule 144A ("Rule 144A").  Private placement securities may be sold only to "qualified institutional buyers" ("QIBs"), which are generally defined as purchasers of securities that are considered financially sophisticated.  Securities sold pursuant to Rule 144A cannot be, when originally issued, of the same class as securities listed on a national exchange, such as the New York Stock Exchange, or quoted on a U.S. automated inter-dealer quotation system.  In contrast to publicly traded securities, including stocks, bonds, notes, and mutual funds, among others, under

Rule 144A, private placement offerings are exempt from registration and significant disclosure requirements under the Securities Act.

60.     Much of the Fund's asset base – consisting of Rule 144A private placement offerings – had very little price transparency and, therefore, little liquidity.[4]   According to an FDIC Supervisory Insights published in December 2007, *Enhancing Transparency in The Structured Finance Market*:

> Historically, private placements [aka rule 144A] of corporate bonds arose as a way to reduce the cost of the securities registration process for companies with an established track record. The rationale for allowing private placements seems less compelling with securitizations. In contrast to corporate bonds, ***securitizations consist of various pooled securities, including MBS and CDOs, that often have no track record and that require an in-depth modeling and understanding of a highly segmented amount of assets that comprise the collateral pool. For this reason, a lack of complete and public dissemination of a securitization's loan-level data reduces transparency and hampers the investor's ability to fully assess risk and assign value.***
>
> The practice of private issuance creates difficulties in obtaining deal-specific information for many analysts, including regulators and academics. As an example, ***most if not all CDOs typically are issued in private offerings. These offerings are exempt from registration and significant disclosure requirements of the Securities Act of 1933.***

---

[4]     The Comptroller of the Currency ("OCC") defines liquidity risk as:

> the risk to earnings or capital arising from a bank's inability to meet its obligations when they come due, without incurring unacceptable losses. Liquidity risk includes the inability to manage unplanned decreases or changes in funding sources. ***Liquidity risk also arises from the bank's failure to recognize or address changes in market conditions that affect the ability to liquidate assets quickly and with minimal loss in value.***

Comptroller of the Currency Administrator of National Banks *Mortgage Banking Comptroller's Handbook Narrative - March 1996, Procedures - March 1998* (emphasis added).

> ***Because underwriters of structured finance products typically do not provide significant disclosure under Rule 144A issuances, there is a danger that negative information may be muffled to obtain the best market pricing for the structure.*** This has the direct effect of improving the profitability of the security underwriter and improving the marketability to both sides of the transaction: the loan originators and security investors. As long as these securities perform, investors are not likely to question their transparency.
>
> . . . .
>
> Market participants attribute [the lack of price transparency] . . . to the ***lack of an established secondary market for these securities*** as most ABS and CDO investors follow a buy-and-hold strategy, ***with trades executed bilaterally between the investor and the dealer bank. As a result, for many product types, actual trade prices generally are not reported in organized or centralized fashion,*** although market participants indicate that the dealer banks have access to this information.

[Emphasis added].

61.     As a consequence, the underwriters of private placement products typically do not provide investors significant information regarding the underlying collateral, such the assets, income, or revenue, securing the financing.  Thus, there is the danger that negative information may be muffled to obtain the best market pricing for the private placement sale.  The lack of complete and public dissemination of a private placement security's loan-level data reduces transparency and hampers the investor's ability to fully assess risk and assign value.

62.     There is no established secondary market for private placement securities because of this lack of transparency.  Thus, most investors follow a buy-and-hold strategy.  Trades are executed bilaterally between the investor and the dealer bank, and actual trade prices generally are not reported in an organized or centralized fashion.  As such, once an investor purchases a private placement security, generally it cannot quickly liquidate the security because there is no publicly established or reported pricing mechanism.  As a result, private placement securities tend to be

highly illiquid and speculative, and become extremely risky during times of financial or economic instability.

63.     The following table demonstrates, on an annual basis, the high percentage of the Fund invested in these illiquid private placements:

**Analysis of Holdings as of
March 31 for the years ending**

|  | **2008** | **2007** | **2006** | **2005** |
|---|---|---|---|---|
| **Net Asset Value** | $731,411,605 | $719,447,424 | $680,892,665 | $622,388,206 |
| **Private placement holdings** | $366,986,779 | $334,353,478 | $278,101,970 | $166,011,347 |
| **% of Net assets** | 50.18% | 46.47% | 40.84% | 26.67% |

64.     Likewise, and as the below chart illustrates, on a quarterly basis, the Fund's assets were largely illiquid:

**Analysis of Holdings**

|  | **3/31/08** | **12/31/07** | **9/30/07** | **6/30/07** |
|---|---|---|---|---|
| **Net Asset Value** | $731,411,605 | $741,608,649 | $720,931,058 | $764,151,476 |
| **Private placement holdings** | $366,986,779 | $378,187,364 | $289,408,884 | $366,356,898 |
| **% of Net assets** | 50.18% | 51.00% | 40.14% | 47.94% |
|  | **3/31/07** | **12/31/06** | **9/30/06** | **6/30/06** |
| **Net Asset Value** | $719,447,424 | $596,678,168 | $648,603,983 | $670,977,347 |
| **Private placement holdings** | $334,353,478 | $291,876,980 | $268,951,224 | $295,925,431 |

| **% of Net assets** | 46.47% | 48.92% | 41.47% | 44.10% |
|---|---|---|---|---|
| | **3/31/06** | **12/31/05** | **9/30/05** | **6/30/05** |
| **Net Asset Value** | $680,892,665 | $610,070,657 | $638,885,363 | $641,281,168 |
| **Private placement holdings** | $278,101,970 | $241,002,430 | $180,513,933 | $182,100,330 |
| **% of Net assets** | 40.84% | 39.50% | 28.25% | 28.40% |
| | **3/31/05** | | | |
| **Net Asset Value** | $622,388,206 | | | |
| **Private placement holdings** | $166,011,347 | | | |
| **% of Net assets** | 26.67% | | | |

65.     As a result, while the Fund claimed to have no more than 15 percent of its assets in illiquid securities, in reality the Fund was far more illiquid than represented to investors.

**5.     The Fund Invested in Riskier MBSs Than Represented**

66.     In addition to longer durations and illiquid private placements, throughout the Class Period, the Fund heavily invested in MBSs.  Yet, during the same time period there was a downturn in the housing and subprime mortgage markets which caused housing values to plummet and mortgagees to default on their loan obligations at rates not seen in several decades.  Many MBSs, including a substantial number held by the Fund, were collateralized by loans and mortgages caught in the middle of the housing and subprime debacle.  As the housing and subprime crisis intensified, the value of MBSs plummeted.  Investors found the market for many MBSs nonexistent, rendering

many MBSs essentially illiquid.  As detailed below, the market had realized the inherent risks associated with investments in MBSs in 2006.

67.     Between the mid-1990s and 2005, the mortgage finance industry introduced loan products with reduced origination standards, including those with approval standards for low-credit applicants.  By way of example, loan underwriters allowed customers with inferior credit scores to be approved for mortgages.  Loan originators also allowed borrowers to finance a greater percentage of a particular property's value – lending even 100% of the value of a home – thereby allowing mortgagors to carry increased debt loads.  Mortgages issued with these standards are generally referred to as "subprime mortgages."

68.     Aside from the decreased underwriting standards, loan originators waived documentation requirements, issued interest-only mortgages that enabled borrowers to pay interest-only for a specified period of time at the outset of the repayment period, and underwrote adjustable rate mortgages ("ARMs") that were initially repaid at a low fixed-rate and then converted to adjust or account for market rates.

69.     As further detailed below, the diminished approval standards stimulated the rate of home sales and home ownership in the United States.  The commercial real estate market likewise experienced substantial growth.

70.     By way of background, in the early 1990s, the mortgage industry transitioned from a system in which a bank or lender issued a loan to a borrower and held the mortgage note to maturity (known as the "originate-to-hold" model) to a system in which other entities would purchase the mortgages from the loan originators (known as the "originate-to-securitize" model).

71.     The "originate-to-securitize" model allowed loan originators to gain additional and immediate capital that they could use to underwrite new loans, while a secondary market – the mortgage purchasers – assumed the inherent default risk associated with the notes.

72.     Through a securitization of mortgage notes, several Wall Street financial services firms pooled mortgages into MBSs and then re-sold the collective cash value of the underlying mortgages to investors.  Investors, in turn, obtained the future principal and interest payments to be made by the mortgagors.

73.     The mortgage-backed securities, known as collateralized debt obligations ("CDOs"), were separated into risk categories and the market value of each CDO was dependent upon the flow of principal and interest – or the underlying collateral – paid by borrowers in connection with their respective mortgages.

74.     MBSs became a major source of revenues for investment firms, thereby increasing the securitization of mortgage notes and increasing the demand for additional mortgage notes to purchase and pool.  As a result, in order to meet the increased need or call for mortgage notes to securitize, loan originators were willing to forego or reduce certain underwriting standards associated with the issuance of mortgages, as set forth above.

75.     A combination of several market factors, including a dramatic decrease in real estate values and a rise in interest rates (particularly on those loans procured with ARMs), negatively impacted the value of MBSs.

76.     Specifically, the steady appreciation in residential home values halted in 2006.  At or around the same period in time, mortgage interest rates rose.  The combination of these factors

resulted in countless home foreclosures.  Approximately one year later, the commercial real estate market was similarly impacted.

77.     As a result, in 2007, MBSs experienced huge value declines from what became known as the subprime mortgage crisis.  Specifically, residential MBSs ("RMBSs") were known to be negatively impacted in early 2007 and the widespread decline in commercial MBSs ("CMBSs") became prevalent in mid-2007.

78.     As a result of a combination of factors, including the downturn in the real estate markets and the burgeoning credit crisis, MBSs lost substantial value.  Consequently, determining the value of MBSs became increasingly difficult as the underlying worth of the mortgages that formed the MBSs was either unknown or difficult to calculate.  In some cases, there was simply no market for the sale of MBSs, which became largely illiquid.

79.     Indeed, between April and August 2007, various Wall Street financial services firms announced huge declines in the value of their funds invested in MBSs.

80.     For example, on July 18, 2007, Bear Stearns announced that it was winding down one its funds that was negatively impacted by investments in MBSs.

81.     In January 2008, Bristol-Myers Squibb Co. announced that it would take a sizeable impairment charge in connection with its write-down of auction-rate securities, which incurred a reduction in value of approximately 50 percent.

82.     The following month, several Wall Street firms – including UBS, Merrill Lynch & Co. and Citigroup Inc. – stopped supporting auctions for MBSs, resulting in widespread auction failures and leaving numerous investors holding illiquid securities.

83.     In the latter portion of 2006 and into 2007, this downturn essentially rendered many MBSs illiquid and speculative.  On July 5, 2007, *The New York Times* published an article noting that Countrywide, the nation's largest mortgage lender, had stated "that more borrowers with good credit were falling behind on their loans and that the housing market might not begin recovering until 2009 because of a decline in house prices that goes beyond anything experienced in decades." The article also noted that:

> Countrywide's stark assessment signaled a critical change in the substance and tenor of how housing executives are publicly describing the market. Just a couple of months ago, some executives were predicting a relatively quick recovery and saying that most home loans would be fine with the exception of those made to borrowers with weak credit who stretched too far financially.

84.     Despite the obvious reduction in the value of MBSs, the valuation of the Fund's NAV throughout the Class Period until about the middle of 2008 remained virtually unchanged, consistently trading above $9.50 per share until January 2008.  In addition, the Fund continued touting the safety and reliability of its investments.

85.     Ratcheting up the risk, Defendants also employed a strategy of investing in mortgage-backed structured debt that primarily relied upon risky and untested loan products such as subprime and Alt-A loans.  To make matters worse, many of the Fund's loan assets – similar to their private placement investments – were collateralized with unseasoned loans.

86.     The OCC describes management of this risk in mortgage operations in their publication *Mortgage Banking Comptroller's Handbook Narrative - March 1996, Procedures - March 1998*:

> The credit quality of loans that a mortgage bank originates affects the overall value of the mortgage servicing rights and the bank's cost of servicing those loans. Because poor credit quality lowers the value of servicing rights and increases the underlying cost of performing servicing functions, it is essential that a mortgage bank effectively

monitor the quality of loans it originates.

One common technique mortgage banks use to monitor loan quality is vintage analysis, which tracks delinquency, foreclosure, and loss ratios of similar products over comparable time periods. The objective of vintage analysis is to identify sources of credit quality problems early so that corrective measures can be taken. *Because mortgages do not reach peak delinquency levels until they have seasoned 30 to 48 months, tracking the payment performance of seasoned loans over their entire term provides important information. That information allows the bank to evaluate the quality of the unseasoned mortgages over comparable time periods and to forecast the impact that aging will have on credit quality ratios.*

[Emphasis added].

87.    An analysis conducted by Plaintiffs of selected mortgage-backed assets held by the Fund reflects a loss of over 65% of their value over the six-month period ending September 30, 2008.  Based on information obtained from Bloomberg, these assets all had a high percentage of limited documentation mortgage loans and incurred a dramatic increase in delinquencies as the loans seasoned:

**Analysis of selected holdings March 31 to September 30, 2008**

|  | 31-Mar-08 | 30-Sep-08 | As of September 30, 2008 | | |
|  | Current value | Current value | Losses | % Limited Document-ation | % Delinqu-ent 60 + |
| --- | --- | --- | --- | --- | --- |
| Adjustable Rate Mtge. TrustSer. 2005-9, Class 4A2, 5.35%, 11/25/2035µ | $6,189,730 | $1,647,744 | ($4,541,986) | 69.30% | 7.70% |
| **Countrywide Home Loans, Inc.:** | | | | | |
| Ser. 2004-HYB8, Class 1B1, 6.75%, 01/20/2035 | $2,393,267 | $281,359 | ($2,111,908) | 70.00% | 12.60% |
| Ser. 2004-HYB8, Class 1B2, 6.75%, 01/20/2035 | $1,901,660 | $1,009,167 | ($892,493) | 70.00% | 12.60% |
| Ser. 2004-HYB8, Class 1M2, 6.75%, 01/20/2035 | $3,029,228 | $313,126 | ($2,716,102) | 70.00% | 12.60% |

26

**DSLA Mtge. Loan Trust:**

| | | | | |
|---|---|---|---|---|
| Ser. 2005-AR1, Class X2, IO, 0.78%, 03/19/2045 | $1,978,089 | $627,453 | ($1,350,636) | 87.50% | 30.90% |

**IndyMac INDX Mtge. Loan Trust:**

| | | | | |
|---|---|---|---|---|
| Ser. 2005-AR8, Class AX2, IO, 3.47%, 04/25/2035 | $2,915,611 | $853,955 | ($2,061,656) | 81.90% | 21.40% |

**Structured Adjustable Rate Mtge. Loan Trust:**

| | | | | |
|---|---|---|---|---|
| Ser. 2004-16, Class 1A, 7.32%, 11/25/2034 | $9,727,051 | $8,583,526 | ($1,143,525) | 63.19% | 22.50% |
| Ser. 2004-16, Class B6, 5.87%, 11/25/2034 | $6,258,654 | $1,247,250 | ($5,011,404) | 63.19% | 22.50% |
| Ser. 2004-16, Class 1A3, 7.32%, 11/25/2034 | $694,905 | $259,541 | ($435,364) | 63.19% | 22.50% |

**Banc of America Funding Corp.:**

| | | | | |
|---|---|---|---|---|
| Ser. 2005-E, Class DB1, 6.98%, 06/20/2035 | $10,889,724 | $1,922,062 | ($8,967,662) | 77.08% | 32.20% |
| Ser. 2005-E, Class DB2, 6.98%, 06/20/2035 | $3,593,696 | $413,566 | ($3,180,130) | 77.08% | 32.20% |
| Banc of America Funding Corp., Ser. 2006-D, Class 2A1, 5.68%, 05/20/2036+ | 2,908,065 | 1,853,873 | (1,054,192) | 100.0% | |
| Countrywide Home Loans, Inc., Ser. 2004-HYB8, Class 1-M1, 5.27%, 01/20/2035+ | 3,496,737 | 355,780 | (3,140,957) | 100.0% | 8.13% |
| First Horizon Alternative Mtge. Securities, Ser. 2005-AA10, Class 2A1, 5.75%, 12/25/2035+ | 2,253,467 | 1,502,604 | (750,863) | 55.37% | 9.34% |

**Harborview Mtge. Loan Trust:**

| | | | | |
|---|---|---|---|---|
| | | | | N/A | 15.11% |
| Ser. 2004-6, Class 1A, 4.52%, 08/19/2034+ | 2,413,012 | 1,477,601 | (935,411) | | |

| | | | | |
|---|---|---|---|---|
| Ser. 2005-7, Class 1A2, 4.92%, 06/19/2045+ | 10,365,766 | 6,343,043 | (4,022,723) | 100.0% | 8.05% |
| MASTR Alternative Loan Trust, Ser. 2005-2, Class 1A2, 6.50%, 03/25/2035+ | 528,482 | 386,092 | (142,390) | 79.27% | 22.84% |
| | | | | | |
| **Countrywide Home Loans, Inc.:** | | | | 67.68% | 11.19% |
| Ser. 2004-23, Class A, 4.58%, 11/25/2034+ | 4,783,898 | 4,143,317 | (640,581) | | |
| Ser. 2004-HYB8, Class 5A1, 5.24%, 01/20/2035+ | 2,232,006 | 1,176,504 | (1,055,502) | 66.75% | 12.77% |
| | | | | | |
| **IndyMac INDX Mtge. Loan Trust:** | | | | 69.96% | 12.63% |
| Ser. 2004-AR14, Class AX2, IO, 0.53%, 01/25/2035 o+ | 1,314,973 | 920,899 | (394,074) | | |
| Ser. 2005-AR3, Class 4A1, 5.44%, 04/25/2035+ | 3,194,213 | 2,244,098 | (950,115) | 76.01% | 25.32% |
| | | | | | |
| **Countrywide Alternative Loan Trust:** | | | | 62.12% | 7.53% |
| Ser. 2002-07, Class M, 7.00%, 08/25/2032+ | 7,476,131 | 6,091,687 | (1,384,444) | | |
| Ser. 2002-16, Class B1, 6.00%, 12/25/2032+ | 2,450,955 | 1,635,991 | (814,964) | 31.78% | 10.91% |
| Ser. 2002-18, Class M, 6.00%, 02/25/2033+ | 5,662,488 | 3,042,678 | (2,619,810) | 87.94% | 3.97% |
| | | | | | |
| **Banc of America Mtge. Securities, Inc.:** | | | | 79.73% | 3.18% |
| Ser. 2002-G, Class 2B3, 6.29%, 07/20/2032+ | 322,988 | 35,031 | (287,957) | | |
| Ser. 2002-K, Class B4, 6.36%, 10/20/2032 144A+ | 246,999 | 45,370 | (201,629) | | 8.62% |
| Ser. 2004-G, Class B3, 4.65%, 08/25/2034+ | 4,131,509 | 1,742,793 | (2,388,716) | | 8.62% |
| Ser. 2004-H, Class B2, 4.69%, 09/25/2034+ | 3,347,441 | 1,913,207 | (1,434,234) | 100.0% | 1.61% |
| Ser. 2004-H, Class B3, 4.69%, 09/25/2035+ | 1,659,683 | 527,863 | (1,131,820) | 100.0% | 2.33% |
| Ser. 2004-I, Class B3, 4.83%, 10/25/2035+ | 1,590,603 | 778,243 | (812,360) | 100.0% | 2.33% |

28

| | | | | | |
|---|---:|---:|---:|---:|---:|
| **Countrywide Home Loans, Inc.:** | | | | 100.0% | 2.31% |
| Ser. 2004-HYB8, Class 1M2, 5.27%, 01/20/2035+ | 3,029,228 | 313,126 | (2,716,102) | | |
| **Harborview Mtge. Loan Trust:** | | | | 55.37% | 9.34% |
| Ser. 2004-7, Class 2A2, 5.35%, 11/19/2034+ | 635,758 | 445,388 | (190,370) | | |
| Ser. 2004-7, Class B2, 5.46%, 11/19/2034+ | 1,374,063 | 469,386 | (904,677) | 72.42% | 11.67% |
| Ser. 2004-7, Class B3, 5.46%, 11/19/2034 o+ | 3,537,130 | 916,966 | (2,620,164) | 72.42% | 11.67% |
| Ser. 2005-8, Class 2B3, 5.43%, 02/19/2035 o+ | 8,303,704 | 1,141,171 | (7,162,533) | 72.42% | 11.67% |
| Ser. 2005-8, Class 2B4, 5.43%, 02/19/2035+ | 5,346,181 | 1,090,592 | (4,255,589) | 86.06% | 21.57% |
| **Structured Adjustable Rate Mtge. Loan Trust:** | | | | 86.06% | 21.57% |
| Ser. 2004-08, Class B3, 4.83%, 07/25/2034+ | 6,971,863 | 2,651,251 | (4,320,612) | | |
| Ser. 2004-14, Class B6, 4.94%, 10/25/2034 o+ | 4,671,945 | 1,328,726 | (3,343,219) | 54.75% | 4.61% |
| Ser. 2004-18, Class 3A2, 5.37%, 12/25/2034+ | 6,230,924 | 2,511,053 | (3,719,871) | 54.75% | 4.61% |
| Ser. 2005-12, Class B4, 5.34%, 06/25/2035+ | 2,613,667 | 659,731 | (1,953,936) | 69.91% | 6.22% |
| Ser. 2005-12, Class B6, 5.34%, 06/25/2035+ | 2,631,459 | 326,561 | (2,304,898) | 25.66% | 10.52% |
| Ser. 2006-7, Class 1A2, 5.79%, 08/25/2036 o+ | 4,621,330 | 756,286 | (3,865,044) | 25.66% | 10.52% |
| **Total holdings** | **$159,918,283** | **$65,985,660** | **($93,932,623)** | | |

88.     Given that primarily unseasoned and limited documentation mortgage loans collateralized the securities held by the Fund, and that their performance was so critical to the Fund's performance, the Fund's significant investments in these assets, in combination with the high

percentage of investments in private placement structured debt, greatly increased the risk borne by investors.

89.     Defendants' massive investments in private placements and other illiquid securities thus was directly at odds with the Fund's marketing as a safe, liquid, and higher-yielding alternative to money-market funds, touting the objectives of "preservation of capital" and "low principal fluctuation."

90.     As such, the investment strategy of the Fund was risky, speculative and subject to potentially extreme credit risk and price fluctuations.  Accordingly, the Fund was not a safe, stable, "ultrashort" bond fund that provided "current income consistent with preservation of capital and low principal fluctuation."   To the contrary, the Fund's portfolio holdings were extremely sensitive to changes in interest rates, illiquid, and overvalued throughout the Class Period.

### 6.     The Fund Took Greater Investment Risks Than Represented

91.     As a result of the foregoing, the Fund was not a short bond fund, let alone an ultra short bond fund, and should not have been compared to the Lehman 6-Month Treasury Bill Index or the Lehman Brothers Government/Credit 0-2.5 Year Index.  Those indices are only appropriate for stable, safe, and highly liquid short bond funds, not speculative and risky funds, such as the Fund.

92.     Plaintiffs' analysis of the risky, illiquid, and longer-duration nature of the Fund's holdings is confirmed by the statements of a former assistant portfolio manager in Evergreen's Structured Finance Group ("CW1"), which was responsible for the management of the Fund. According to CW1, the Fund invested heavily in private placements at the direction of the Fund's managers, Lisa Brown Premo and Bob Rowe, who wanted to follow the investment strategies

pursued by more aggressive funds, such as hedge funds.  As CW1 explained, "there was a concerted effort by Lisa and Bob to become less conservative."

**B.     Defendants' Offering Materials**

93.     During the Class Period, Evergreen Trust filed Registration Statements with the SEC for the sale of all classes of shares in the Fund.  The shares were issued to investors pursuant to a series of Registration Statements (the "Registration Statements").  The Registration Statements caused the false and misleading statements of the Fund's Prospectuses (stated below) to be filed with the SEC. The dates of the relevant Registration Statements, as filed with the SEC during the Class Period, are as follows:

- Registration Statement filed pursuant to Form 485BPOS on October 28, 2005, and made effective that same day ("2005 Registration Statement");

- Registration Statement filed pursuant to Form 485BPOS on October 26, 2006; and made effective that same day ("2006 Registration Statement"); and

- Registration Statement filed pursuant to Form 485BPOS on October 26, 2007 and made effective on November 1, 2007 ("2007 Registration Statement").

94.     The Fund was marketed and sold to investors pursuant to Prospectuses and their supplements, including those filed with the SEC during the Class Period, as follows:

- Prospectus filed with the SEC pursuant to Form 485BPOS on October 28, 2005, and dated November 1, 2005 ("2005 Prospectus");

- Prospectus filed with the SEC pursuant to Form 485BPOS on October 26, 2006, and dated November 1, 2006 ("2006 Prospectus");

- Prospectus/Proxy Statement filed with the SEC pursuant to Form 497 on July 27, 2007 and dated August 6, 2007 ("August 6, 2007 Prospectus"); and

- Prospectus filed with the SEC pursuant to Form 485BPOS on October 26, 2007, and dated November 1, 2007 ("November 1, 2007 Prospectus").

These four Prospectuses (collectively, the "Prospectuses") were false and misleading as described in detail herein.

95.     The Prospectuses were regularly supplemented by the following statements of additional information ("SAIs"), which provided additional information regarding the Fund's investments:

### Statements of Additional Information

- Statement of Additional Information, filed with the SEC pursuant to Form 497 on  November 2, 2005 and made effective November 1, 2005;

- Supplement to the Prospectus and Statement of Additional Information, filed with the SEC pursuant to Form 497 on January 3, 2006 and effective that same day;

- Supplement to the Prospectus and Statement of Additional Information, filed with the SEC pursuant to Form 497 on  February 10, 2006 and made effective February 9, 2006;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on March 31, 2006 and made effective April 3, 2006;

- Supplement to the Statement of Additional Information, filed with the SEC pursuant to Form 497 on June 15, 2006 and effective that same day;

- Supplement to the Statement of Additional Information, filed with the SEC pursuant to Form 497 on July 28, 2006 and effective that same day;

- Supplement to the Prospectus and Statement of Additional Information, filed with the SEC pursuant to Form 497 on September 22, 2006 and made effective October 1, 2006;

- Supplement to the Statement of Additional Information, filed with the SEC pursuant to Form 497 on September 29, 2006 and made effective September 28, 2006;

- Post-Effective Amendment No. 37 to the Registration Statement, filed with the SEC pursuant to Form 497-J on November 1, 2006 and effective that same day;

- Supplement to the Statement of Additional Information, filed with the SEC pursuant to Form 497 on November 29, 2006 and effective November 20, 2008;

- Supplement to the Prospectus and Statement of Additional Information, filed with the SEC pursuant to Form 497 on December 18, 2006 and made effective April 1, 2007;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on December 19, 2006 and made effective April 1, 2007;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on December 28, 2006 and effective that same date;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on December 29, 2006 and made effective December 28, 2006;

- Supplement to the Statement of Additional Information, filed with the SEC pursuant to Form 497 on February 1, 2007 and effective that same date;

- Supplement to the Statement of Additional Information, filed with the SEC pursuant to Form 497 on February 22, 2007 and effective that same date;

- Supplement to the Prospectus and Statement of Additional Information, filed with the SEC pursuant to Form 497 on June 14, 2007 and effective that same day;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on August 28, 2007 and effective that same day;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on September 19, 2007 and effective that same day;

- Supplement to the Statements of Additional Information, filed with the SEC pursuant to Form 497 on October 1, 2007 and made effective January 1, 2008;

- 497 Filing, filed with the SEC pursuant to Form 497-J on October 30, 2007 and effective that same day;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on November 9, 2007 and effective that same day;

33

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on December 7, 2007 and effective that same day;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on December 31, 2007 and effective that same day;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on January 2, 2008 and effective that same day;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on February 8, 2008 and effective that same day;

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on March 13, 2008 and effective that same day; and

- Supplement to the Prospectus, filed with the SEC pursuant to Form 497 on April 21, 2008 and effective that same day.

Several of the SAI's listed in this paragraph were false and misleading as described in detail herein.

96.     The Fund filed annual and semi-annual reports, including those filed with the SEC during the Class Period and which were incorporated into the Prospectuses, as follows:

### **Semi-Annual and Annual Certified Shareholder Reports**

- Annual Report filed with the SEC pursuant to Form N-CSR on September 6, 2005 ("2005 Annual Report");

- Semi-Annual Report filed with the SEC pursuant to Form N-CSRS on March 7, 2006 ("2006 Semi-Annual Report");

- Annual Report filed with the SEC pursuant to Form N-CSRS on September 6, 2006 ("2006 Annual Report");

- Semi-Annual Report filed with the SEC pursuant to Form N-CSRS on March 7, 2007 ("2007 Semi-Annual Report");

- Annual Report filed with the SEC pursuant to Form N-CSR on September 4, 2007 ("2007 Annual Report"); and

- Semi-Annual Report filed with the SEC pursuant to Form N-CSRS on March 6, 2008 ("2008 Semi-Annual Report").

**C.     Defendants' Offering Materials Contained Untrue Statements of Material Fact and Omitted Material Facts Necessary to Make Defendants' Statements Not Misleading**

97.     The Registration Statements, Prospectuses, SAIs, and Certified Shareholder Reports filed with the SEC throughout the Class Period contained untrue statements of material fact and omitted material facts necessary to make the statements therein not misleading.

**1.     The misstatements and omissions of material fact contained in the Fund's Registration Statements and SEC-filed Prospectus materials**

98.     Starting with the October 28, 2005 Registration Statement and Prospectus, Defendants issued and offered for sale shares of the Fund, along with associated sales materials and advertisements, including web pages which also constitute a prospectus under the securities laws. Defendants continuously filed nearly identical Registration Statements and Prospectuses throughout the Class Period and continued to offer and sell the Fund's newly issued securities.

99.     The Offering Materials used throughout the Class Period to register and offer shares of the Fund to Plaintiff and the Class contained statements of material facts and omitted material facts necessary to make the statements therein not misleading.  While the Fund's Offering Materials issued during the Class Period were not perfectly identical, they did contain many of the same untrue statements and were rendered misleading by the same omissions, as set forth below.

100.     2005 Prospectus:

- "The Fund seeks to provide current income consistent with preservation of capital and low principal fluctuation."

- "[A]ppropriate for investors who: seek income consistent with low volatility or capital growth; and seek a Fund which has a shorter duration compared to other bond funds."

35

- "The portfolio managers intend to maintain a minimum weighted average credit quality of Aa3, as defined by Moody's Investors Services, Inc., or an equivalent rating by another NRSRO."

- "Under normal market conditions, the Fund intends to maintain an average portfolio duration of approximately one year or less."

- "The Fund may not invest more than 15% (10% for money market funds) of its net assets in securities that are illiquid."

- "The value of one share of the Fund is calculated by adding up the Fund's total assets, subtracting all liabilities, then dividing the result by the total number of shares outstanding."

- The Prospectus compared the Fund's average annual total returns to the Lehman 6-Month Treasury Bill Index and the Lehman Brothers Government/Credit 0-2.5 Year Index.

101.    Each of these representations in the 2005 Prospectus is false and misleading for the reasons stated in ¶¶49-92.  In addition, the statements were false and misleading because:

(a)    The Fund was not a safe, liquid and stable investment suitable for conservative investors;

(b)    The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund."  Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation";

(c)    The Fund did not maintain an average portfolio duration of approximately one year or less;

(d)    The Fund's performance was not comparable to the Lehman 6-Month Treasury Bill Index or the Lehman Brothers Government/Credit 0-2.5 Year Index.  The average duration of the Fund's portfolio exceeded one year throughout most of the Class Period, significantly

36

higher than the durations associated with these indices.  Thus, the Fund's portfolio had far greater

interest rate, credit and liquidity risks than the bond funds appropriately compared to these indices;

(e)     An increasingly substantial percentage of the Fund was invested in

speculative, illiquid, private placement structured finance securities, which were incompatible with a

short-term bond fund.  In fact, in 2005, 26.67% of the Fund's Net Assets were in private placement

holdings.  By 2008, over 50% of the Fund's Net Assets were in private placement holdings.  Thus,

over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy;

(f)     The asset allocation of the Fund was inconsistent with Defendants'

representation that the Fund was managed to minimize price fluctuations; and

(g)     Throughout the Class Period, a substantial proportion of the assets held by the

Fund were essentially illiquid and should have been priced substantially lower than stated.  An

accurate valuation of the NAV, as calculated for Plaintiffs by a sophisticated industry expert, would

have been significantly lower than the represented NAV during the Class Period.  As a result, the

Fund's NAV was dramatically overstated.

102.   2006 Prospectus:

- "The Fund seeks to provide current income consistent with preservation of capital and low principal fluctuation."

- "[A]ppropriate for investors who: seek income consistent with low volatility or capital growth; and seek a Fund which has a shorter duration compared to other bond funds."

- "The portfolio managers intend to maintain a minimum dollar-weighted average credit quality of Aa3, as defined by Moody's Investors Services, Inc., or an equivalent rating by another nationally recognized statistical ratings organization.  Security ratings are determined at the time of investment and are based on ratings received by nationally recognized statistical organizations, or, if a security is not rated, it will be deemed to

have the same rating as a security determined to be of comparable quality by the Fund's portfolio manager."

- "Under normal market conditions, the Fund intends to maintain an average portfolio duration of approximately one year or less."

- "The Fund may not invest more than 15% (10% for money market funds) of its net assets in securities that are illiquid."

- "The value of one share of the Fund, also known as the net asset value, or NAV, is calculated by adding up the Fund's total assets, subtracting all liabilities, then dividing the result by the total number of shares outstanding."

- The Prospectus compared the Fund's average annual total returns to the Lehman 6-Month Treasury Bill Index and the Lehman Brothers Government/Credit 0-2.5 Year Index.

103.    Each of these representations in the 2006 Prospectus is false and misleading for the reasons stated in ¶¶49-92.  In addition, the statements were false and misleading because:

(a)    The Fund was not a safe, liquid and stable investment suitable for conservative investors;

(b)    The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund."  Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation";

(c)    The Fund did not maintain an average portfolio duration of approximately one year or less;

(d)    The Fund's performance was not comparable to the Lehman 6-Month Treasury Bill Index or the Lehman Brothers Government/Credit 0-2.5 Year Index.  The average duration of the Fund's portfolio exceeded one year throughout most of the Class Period, significantly

higher than the durations associated with these indices.  Thus, the Fund's portfolio had far greater interest rate, credit and liquidity risks than the bond funds appropriately compared to these indices;

(e)     An increasingly substantial percentage of the Fund was invested in speculative, illiquid, private placement structured finance securities, which were incompatible with a short-term bond fund.  In fact, in 2005, 26.67% of the Fund's Net Assets were in private placement holdings.  By 2008, over 50% of the Fund's Net Assets were in private placement holdings.  Thus, over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy;

(f)     The asset allocation of the Fund was inconsistent with Defendants' representation that the Fund was managed to minimize price fluctuations; and

(g)     Throughout the Class Period, a substantial proportion of the assets held by the Fund were essentially illiquid and should have been priced substantially lower than stated.  An accurate valuation of the NAV, as calculated for Plaintiffs by a sophisticated industry expert, would have been significantly lower than the represented NAV during the Class Period.  As a result, the Fund's NAV was dramatically overstated.

104.    2007 Prospectus:

- "The Fund seeks to provide current income consistent with preservation of capital and low principal fluctuation."

- "[A]ppropriate for investors who: seek income consistent with low volatility or capital growth; and seek a Fund which has a shorter duration compared to other bond funds."

- "The portfolio managers intend to maintain a minimum dollar-weighted average credit quality of Aa3, as defined by Moody's Investors Services, Inc., or an equivalent rating by another nationally recognized statistical ratings organization. Security ratings are determined at the time of investment and are based on ratings received by nationally recognized statistical ratings organizations or, if a security is not rated, it will be deemed to have the same rating as a security determined to be of comparable quality

by the Fund's portfolio managers. If a security is rated by more than one nationally recognized statistical ratings organization, the highest rating is used. The Fund may retain any security whose rating has been downgraded after purchase if the Fund's portfolio managers consider the retention advisable. For the purposes of determining average credit quality, a security's current ratings are considered."

- "Under normal market conditions, the Fund intends to maintain an average portfolio duration of approximately one year or less."

- "The Fund may not invest more than 15% (10% for money market funds) of its net assets in securities that are illiquid."

- "The value of one share of the Fund, also known as the net asset value, or NAV, is calculated by adding up the Fund's total assets, subtracting all liabilities, then dividing the result by the total number of shares outstanding."

- The Prospectus compared the Fund's average annual total returns to the Lehman 6-Month Treasury Bill Index and the Lehman Brothers Government/Credit 0-2.5 Year Index.

105. Each of these representations in the 2007 Prospectus is false and misleading for the reasons stated in ¶¶49-92. In addition, the statements were false and misleading because:

(a) The Fund was not a safe, liquid and stable investment suitable for conservative investors;

(b) The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund." Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation";

(c) The Fund did not maintain an average portfolio duration of approximately one year or less;

(d) The Fund's performance was not comparable to the Lehman 6-Month Treasury Bill Index or the Lehman Brothers Government/Credit 0-2.5 Year Index. The average

40

duration of the Fund's portfolio exceeded one year throughout most of the Class Period, significantly higher than the durations associated with these indices.  Thus, the Fund's portfolio had far greater interest rate, credit and liquidity risks than the bond funds appropriately compared to these indices;

(e)     An increasingly substantial percentage of the Fund was invested in speculative, illiquid, private placement structured finance securities, which were incompatible with a short-term bond fund.  In fact, in 2005, 26.67% of the Fund's Net Assets were in private placement holdings.  By 2008, over 50% of the Fund's Net Assets were in private placement holdings.  Thus, over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy;

(f)     The asset allocation of the Fund was inconsistent with Defendants' representation that the Fund was managed to minimize price fluctuations; and

(g)     Throughout the Class Period, a substantial proportion of the assets held by the Fund were essentially illiquid and should have been priced substantially lower than stated.  An accurate valuation of the NAV, as calculated for Plaintiffs by a sophisticated industry expert, would have been significantly lower than the represented NAV during the Class Period.  As a result, the Fund's NAV was dramatically overstated.

106.    The SAI filed by the Trust on November 2, 2005 contained the following untrue statement of material fact.

- "The Fund may not invest more than 15% (10% for money market funds) of its net assets in securities that are illiquid."

107.    This representation in the SAI filed on November 2, 2005 was false for the reasons for the reasons stated in ¶¶49-92.  In addition, the statement was false and misleading because more than 15 percent of the Fund's net assets were illiquid.

108.    2005 Annual Report:

41

- "The [F]und seeks to provide current income consistent with preservation of capital and low principal fluctuation."

109.    This representation in the 2005 Annual Report is false and misleading for the reasons stated in ¶¶49-92.  In addition, the statement was false and misleading because:

(a)    The Fund was not a safe, liquid and stable investment suitable for conservative investors;

(b)    The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund."  Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation";

(c)    The Fund did not maintain an average portfolio duration of approximately one year or less;

(d)    An increasingly substantial percentage of the Fund was invested in speculative, illiquid, private placement structured finance securities, which were incompatible with a short-term bond fund.  In fact, in 2005, 26.67% of the Fund's Net Assets were in private placement holdings.  By 2008, over 50% of the Fund's Net Assets were in private placement holdings.  Thus, over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy; and

(e)    The asset allocation of the Fund was inconsistent with Defendants' representation that the Fund was managed to minimize price fluctuations.

110.    2006 Annual Report:

- "Our strategy is to seek the highest total return by maximizing income and minimizing price fluctuations."

111.     This representation in the 2006 Annual Report was false and misleading for the reasons stated in ¶¶49-92.  In addition, the statement was false and misleading because:

(a)     The Fund was not a safe, liquid and stable investment suitable for conservative investors;

(b)     The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund."  Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation";

(c)     The Fund did not maintain an average portfolio duration of approximately one year or less;

(d)     An increasingly substantial percentage of the Fund was invested in speculative, illiquid, private placement structured finance securities, which were incompatible with a short-term bond fund.  In fact, in 2005, 26.67% of the Fund's Net Assets were in private placement holdings.  By 2008, over 50% of the Fund's Net Assets were in private placement holdings.  Thus, over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy; and

(e)     The asset allocation of the Fund was inconsistent with Defendants' representation that the Fund was managed to minimize price fluctuations.

112.     2007 Annual Report.

- "The [F]und seeks to provide current income consistent with preservation of capital and low principal fluctuation."

- "The teams supervising … Evergreen Ultra Short Opportunities Fund maintained portfolios of shorter-maturity, higher-quality securities."

113.    These representations in the 2007 Annual Report were false and misleading for the reasons stated in ¶¶49-92.  In addition, the statements were false and misleading because:

(a)     The Fund was not a safe, liquid and stable investment suitable for conservative investors;

(b)     The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund."  Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation";

(c)     The Fund did not maintain an average portfolio duration of approximately one year or less;

(d)     An increasingly substantial percentage of the Fund was invested in speculative, illiquid, private placement structured finance securities, which were incompatible with a short-term bond fund.  In fact, in 2005, 26.67% of the Fund's Net Assets were in private placement holdings.  By 2008, over 50% of the Fund's Net Assets were in private placement holdings.  Thus, over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy; and

(e)     The asset allocation of the Fund was inconsistent with Defendants' representation that the Fund was managed to minimize price fluctuations.

114.    Finally, in their 2008 Semi-Annual Report for the period ended December 31, 2007, Defendants attempted to reassure investors about the safety of the Fund' investments even as the markets for MBSs plunged:

> We are pleased to provide the Semiannual Report for Evergreen Ultra Short Opportunities Fund for the six-month period ended December 31, 2007.

Investors in the domestic fixed income market faced an increasingly challenging environment in the final half of 2007.  Problems that first surfaced in the weakening housing and subprime mortgage markets led to a tightening of credit which, in turn, contributed to widening fears of a dramatic deceleration in the economy's expansion. Against this backdrop, investors sought the highest-quality securities and avoided credit risk.  Longer-maturity Treasuries were the strongest-performing sector in the fixed income market.  Meanwhile, prices of corporate bonds and many asset-backed securities began falling as the yield spreads between Treasuries and lower-rated securities widened. At the same time, the equity market experienced increasing turbulence as investors scrutinized each new economic report for any evidence of a deceleration in the economy's expansion or slowing of corporate profit growth.  In this unstable environment, large capitalization stocks tended to be preferred over smaller cap stocks, while growth stocks held a clear performance edge over value stocks.  Most domestic equity benchmarks posted negative returns for the final quarter of the year.

The U.S. economy slowed noticeably in the closing months of the year.  While Gross Domestic Product grew by approximately 2.5% in 2007, growth slowed to an annual rate of 0.6% in the fourth quarter.  The combination of mortgage-related weakness, higher energy prices and tighter lending standards limited both consumer spending and business investment.  Operating earnings of companies in the S&P 500 declined in the third quarter of the year and were expected to fall again in the final quarter. Massive write-downs of assets by major corporations, most notably in the Financials sector, were a principal factor contributing to the slowing of profit growth. Faced with growing evidence of the economy's slowing, the Federal Reserve Board (the "Fed") began adding liquidity to the nation's financial system, cutting the target fed funds rate from 5.25% to 4.25% in the final months of 2007.  The Fed acted even more forcefully during the first month of 2008, cutting another 1.25 percentage points off the influential target rate in two separate actions within just eight days of each other.  The White House and Congress, meanwhile, negotiated over a fiscal package to re-invigorate the economy through tax cuts and other fiscal actions.

Over the six-month period, the management teams of Evergreen's short- and intermediate-term bond funds pursued strategies based on each fund's objective.  The team managing Evergreen Short Intermediate Bond Fund, for example, focused on the higher-quality tiers of the markets while keeping duration — or price sensitivity to changes in interest rates — close to neutral to the market. At the same time, managers of Evergreen Adjustable Rate Fund continued to emphasize AAA-rated adjustable rate mortgages with relatively stable cash flows. ***The team supervising Evergreen Ultra Short Opportunities Fund, meanwhile, maintained a portfolio of shorter-maturity, higher-quality securities.***  Managers of Evergreen Institutional Enhanced Income Fund maintained a conservative strategy designed to seek a higher yield than a money market fund with only minimal price variability.

We believe the experiences in the investment markets during the past six months have underscored the value of a well-diversified, long-term investment strategy to help soften the effects of volatility in any one market or asset class. As always, we encourage investors to maintain diversified investment portfolios in pursuit of their long-term investment goals.

Please visit us at EvergreenInvestments.com for more information about our funds and other investment products available to you. Thank you for your continued support of Evergreen Investments.

(Emphasis added).

115.    These statements in the 2008 Semi-Annual Report were false and misleading for the reasons stated in ¶¶49-92.  In addition, the statements were false and misleading because:

(a)    The Fund was not a safe, liquid and stable investment suitable for conservative investors;

(b)    The Fund had elements of credit and liquidity risk inconsistent with an "ultrashort bond fund."  Given the asset composition of the Fund, and its resulting exposure to interest rate risk, credit risk, and liquidity risk, it was not a short-term bond fund that provided "current income consistent with preservation of capital and low principal fluctuation";

(c)    The Fund did not maintain an average portfolio duration of approximately one year or less;

(d)    An increasingly substantial percentage of the Fund was invested in speculative, illiquid, private placement structured finance securities, which were incompatible with a short-term bond fund.  In fact, in 2005, 26.67% of the Fund's Net Assets were in private placement holdings.  By 2008, over 50% of the Fund's Net Assets were in private placement holdings.  Thus, over time, the Fund's actual investment strategy was increasingly at odds with its stated strategy; and

(e)     The asset allocation of the Fund was inconsistent with Defendants' representation that the Fund was managed to minimize price fluctuations.

### D.     Defendants' Misrepresentations and Omissions of Material Facts Cause Huge Losses

116.     Due to the false statements and omissions of material facts in the Offering Materials, as described above, hundreds of millions of dollars poured into the Fund at prices set by Defendants, averaging a NAV between $9 and $10 per share throughout the Class Period until its ultimate liquidation.  While the Fund had a mere $41 million in assets under management as of June 30, 2003, as of March 31, 2008, the last reporting period, the Fund's assets under management had ballooned to over $731 million, an increase of almost 1,800% in less than five years.

117.     Then, on June 19, 2008, Defendants announced that the Fund would be liquidated for $7.48 per share.  On that date, the Fund reported a total asset value of $403 million, compared with its reported $731.4 million value on March 31, 2008.  This tremendous decrease in value represents a loss of approximately 44.9%.  The dramatic drop in the Fund's trading price is depicted in the following chart:



118.    Defendants' investments in securities and assets that were at odds with the Fund's stated investment strategies ultimately triggered these staggering losses.  The Fund's heavy investments in risky MBSs, many of which were backed by subprime mortgages, attached the fate of the Fund to the housing and sub-prime mortgage markets.  In addition, and as described above, the Fund invested in more illiquid and longer duration securities than represented.

119.    The $7.48 to be paid to shareholders was calculated after the close of business on June 18, 2008.  The amount paid to shareholders of the Fund in the liquidation was significantly lower than the value of the Fund's shares during the Class Period.  Indeed, only seven business days earlier, on June 9, 2008, the Fund's shares were offered at $9.07 per share.  The unexpected news of

the Fund's liquidation revealed the materially false or misleading statements in the Class Period Offering Materials with respect to the investment strategy the Fund was pursuing, the valuation of the Fund's investments, the NAV of the Fund, the credit quality of the Fund's underlying investments, and the safety and price stability of the Fund's investments during the Class Period.  As a result, Plaintiffs and the members of the Class have suffered damages as the Fund's NAV precipitously dropped in value and the Fund's shares were ultimately cashed out by the Fund at $7.48 per share.

120.     The news that the fund would be liquidated shocked the market.  Indeed, as of March 31, 2008, the Offering Materials disclosed that the Fund held $84.2 million of illiquid assets, or 11.5% of the NAV.  By September 30, 2008, however, and once Defendants correctly valued the Fund's NAV, all of the Fund's investments held as of March 31, 2008, were declared illiquid.  These illiquid investments were in direct contradiction to the Defendants' repeated statements that the Fund would "not invest more than 15% (10% for money market funds) of its net assets in securities that are illiquid."  The illiquidity of the Fund's investments led directly to a sharp decrease in the Fund's NAV over the six months ended September 30, 2008 of approximately $168 million.  Nevertheless, throughout the Class Period until September 30, 2008, the purported value of the Fund's NAV in the Offering Materials remained essentially unchanged and Defendants continued to make representations that the Fund's actual investment strategies were consistent with its stated investment strategy.  These representations were materially false or misleading because the true value of the Fund's NAV had dropped substantially and a significant percentage of the Fund's portfolio holdings were volatile, risky, and illiquid.

49

121.    By the time Defendants liquidated the Fund and revealed the Fund's true investment strategy and NAV valuation, Plaintiffs had incurred hundreds of millions of dollars in losses.  The shareholders of the Fund lost more than 24% of their supposedly safe and liquid investments.  To make matters worse, the full amount of the losses cannot be calculated without the Fund's delinquent fiscal year-end financial statement for the period ending June 30, 2008, which has yet to be filed with the SEC.

### E.    Defendants' Offering Materials Violated Applicable SEC Rules

122.    Under applicable SEC rules and regulations governing the preparation of a Registration Statement and Prospectus, the Offering Materials were required to disclose that the Fund was invested in a high percentage of illiquid securities, riskier MBSs than disclosed to the market, and was subject to significant interest rate risk, as detailed herein.  The Offering Materials failed to contain any such disclosures.  Specifically:

(a)    Pursuant to Item 11(a) of Form S-3, a Registration Statement is required to describe "any and all material changes in the registrant's affairs which have occurred since the end of the last fiscal year . . . ."  The speculative and risky investments, and the decline in liquidity experienced by the Fund, were material changes having an unfavorable impact on the Fund's NAV and, therefore, were required to be disclosed in the Offering Materials but were not; and

(b)    Pursuant to Item 3 of Form S-3, a Registration Statement is required to furnish the information required by Item 503 of Regulation S-K.  Under Item 503(c) of Regulation S-K, an issuer is required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative."  The Fund's speculative and risky investments, and the decline in liquidity experienced by the Fund, made investing in the Fund risky or speculative and,

accordingly, were "significant factors" that made the Fund "risky or speculative" and were required to be disclosed in the Offering Materials but were not.

### F.      The Safe Harbor Provision / Bespeaks Caution Doctrine Is Inapplicable

123.      In an effort to shield Defendants from liability for false and misleading statements, the Offering Materials contained purported "Risk Factors."  However, the stated risk disclosures were neither meaningful nor did they advise investors of the adverse issues then impacting the Fund's operations. Moreover, the disclosures were not meaningful in that they were non-specific, generalized, and characterized any negatives associated with the Fund as potential and prospective when, in fact, the Fund's NAV was overvalued and the Fund invested in riskier than disclosed securities that were largely illiquid.  As a consequence, and for the reasons detailed herein, Defendants are liable for the false and misleading statements contained in the Offering Materials.

### COUNT I

### VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
### AGAINST EVERGREEN TRUST, EVERGREEN SERVICES,
### AND THE INDIVIDUAL DEFENDANTS ON BEHALF OF THE CLASS

124.      Plaintiffs repeat and re-allege the allegations set forth in ¶¶1-123 above as if set forth fully herein.

125.      This Count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the members of the Class.  This claim is not based on and does not sound in fraud and expressly excludes any element of any paragraph that alleges that Defendants' misconduct was intentional, knowing or with reckless disregard for the truth.  Plaintiffs acquired shares in the Fund pursuant to or traceable to each of the Registration Statements.

126.    The Registration Statements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to adequately disclose material facts, as set forth above.

127.    Evergreen Trust is the issuer of the shares that the Fund issued pursuant to the Registration Statements.  As the issuer, Evergreen Trust is strictly liable to Plaintiffs and the members of the Class for the misstatements in, and the omissions from, the Registration Statements.

128.    Each Individual Defendant signed each of the Registration Statements and Evergreen Services was the underwriter of each of the offerings of shares subject to each Registration Statement pursuant to a Principal Underwriting Agreement between Evergreen Trust and Evergreen Services.

129.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration statement were true and without omissions of any material facts and were not misleading.

130.    Plaintiffs and the members of the Class who purchased shares in the Fund issued pursuant to or traceable to one or more of the Registration Statements have sustained damages, to be computed in accordance with Section 11(e) of the Securities Act, 15 U.S.C §§77k(e).

131.    Neither Plaintiffs nor any member of the Class knew, or by the reasonable exercise of care could have known, of the facts concerning the inaccurate and misleading statements and omissions alleged herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based. Less than three years have elapsed between the time that the securities upon which this claim is brought were offered to the public and the filing of this Complaint.

132.    In connection with the sale of shares issued pursuant to the Registration Statements, the Defendants named in this count, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States mails.

133.    By reason of the foregoing, the Defendants named in this count have violated Section 11 of the Securities Act and are liable to Plaintiffs and the members of the Class who purchased shares in the Fund pursuant to and/or traceable to one or more of the Registration Statements, each of whom has been damaged by reason of such violations.

## COUNT II

## VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT
## AGAINST ALL DEFENDANTS

134.    Plaintiffs repeat and re-allege the allegations set forth in ¶¶1-123 above as if set forth fully herein.

135.    This Count is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act on behalf of the members of the Class.  This Claim is asserted against those defendants who were participants in the distribution of the Fund's shares through subsidiaries and trust departments of subsidiaries owned or controlled by Evergreen Investments and Wachovia (hereinafter the "section 12 Defendants") to the Class.

136.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except to the extent any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under section 12, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the section 12 Defendants, other than strict liability or negligence.

53

137.     The section 12 Defendants offered and sold a security – shares of the Fund – by means of prospectuses or were controlling persons of the Fund or of those who offered and sold the Fund's shares.   These prospectuses contained untrue statements of material facts and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, which statements and omissions the section 12 Defendants knew, or in the exercise of reasonable care should have known, were false or were material facts which were required to be disclosed to avoid misleading representations.

138.     The section 12 Defendants actively solicited the sale of the Fund's shares to serve their own financial interests.

139.     Plaintiffs did not know that the representations described above were untrue and did not know the above-described material facts that were not disclosed.

140.     As a result of the matters set forth herein, pursuant to section 12(a)(2) of the Securities Act Plaintiffs and Class members are entitled to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if they no longer own such shares.

141.     Plaintiffs and putative Class members who do not opt out hereby tender their shares in the Fund.

142.     The section 12 Defendants are liable to Plaintiffs and Class members pursuant to section 12 (a)(2) of the Securities Act, as sellers of the Fund's shares.

**COUNT III**

**VIOLATION OF SECTION 15 OF THE SECURITIES ACT AGAINST DEFENDANTS WACHOVIA, EVERGREEN INVESTMENTS AND THE INDIVIDUAL DEFENDANTS**

143.     Plaintiffs repeat and re-allege the allegations set forth in ¶¶1-123 above as if set forth fully herein.

144.     This Count is brought by Plaintiffs pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the members of the Class.  This Claim is not based on and does not sound in fraud and expressly excludes any element of any paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth and any element of a paragraph that otherwise sounds in fraud.

145.     Each of the defendants named in this Count was a control person of Evergreen Trust by virtue of the following facts:

(a)     Evergreen Investments was, at all relevant times, the investment advisor for the Fund, and responsible for all of the investments made by the Fund and their valuation.  In addition, defendant Ferro was, at all relevant times, the President and Chief Executive Office of Evergreen Investments and the Principal Executive Officer of Evergreen Trust.

(b)     Wachovia is the corporate parent of Evergreen Investments and thus controlled and had the ability to control Evergreen Trust through Evergreen Investments.

146.     Each of the Individual Defendants was a control person of Evergreen Trust by virtue of his position as a director and/or senior officer of Evergreen Trust.

147.     Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12 of the Securities Act alleged in the Counts above, based on their having signed or authorized the signing of one or more of the Registration Statements and having otherwise

participated in the process which allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Fund.

148.     None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements detailed above were true and devoid of any omissions of material fact.  Therefore, by reason of their positions of control over the Evergreen Trust, as alleged herein, pursuant to section 15 of the Securities Act, each of these defendants is liable jointly and severally with and to the same extent that Evergreen Trust is liable to Plaintiffs and the members of the Class as a result of the wrongful conduct alleged herein.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

(a)     Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)     Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

(d)     Awarding such other relief as this Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  April 30, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PAUL J. GELLER
JACK REISE
DOUGLAS WILENS


_____
                *s/ Jack Reise*
JACK REISE

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

PAGE PERRY, LLC
J. BOYD PAGE
JAMES M. EVANGELISTA
DAVID J. WORLEY
1040 Crown Pointe Parkway, Suite 1050
Atlanta, GA  30338
Telephone:  770/673-0047
770/673-0120 (fax)

COHEN, PLACI TELLA & ROTH, P.C
STEWART L. COHEN
SHANNON O. LACK
Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:  215/567-3500
215/567-6019 (fax)

Co-Lead Counsel for Plaintiffs

PYLE, ROME, LICHTEN, EHRENBERG
  & LISS-RIORDAN, P.C.
BETSY EHRENBERG, BBO #554628
18 Tremont Street, Suite 500
Boston, MA  02108
Telephone:  617/367-7200
617/367-4820 (fax)

Liaison Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 5, 2009, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel

of record.

<em>s/ Jack Reise</em>
JACK REISE