**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE EVERGREEN ULTRA SHORT OPPORTUNITIES FUND SECURITIES LITIGATION | ) ) ) | No. 1:08-CV-11064-NMG |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ......................................................................... 2

    A.    The Ultra Short Fund ......................................................................... 2

    B.    The Ultra Short Fund's Liquidation.................................................... 4

    C.    The Regulatory Settlement ................................................................ 5

    D.    Lead Plaintiffs' Claims And Proposed Class..................................... 6

III.   LEGAL STANDARD.................................................................................... 8

IV.   ARGUMENT ................................................................................................ 9

    A.    Lead Plaintiffs Do Not Have Standing To Represent
         The Entire Proposed Class Period...................................................... 9

         1.    Lead Plaintiffs Do Not Have Standing Under Section 11
             Or 12(a)(2) To Represent Ultra Short Fund Shareholders
             Who Purchased Prior To October 26, 2006 .......................... 10

    B.    Lead Plaintiffs Are Not Adequate Class Representatives.................. 11

         1.    A Significant, Irreconcilable Conflict Exists Between
             Lead Plaintiffs And Absent Putative Class Members............ 12

    C.    Lead Plaintiffs Claims Are Not Typical Of The Claims Of The
         Class, Common Issues Do Not Predominate, And A Class
          Action Is Not A Superior Method Of Adjudicating This Matter....... 16

         1.    Lead Plaintiffs' Claims Are Not Typical And
             Individual Issues Predominate Because Different
             Circumstances Surround Class Members' Acquisitions
             Of Shares In The Ultra Short Fund ....................................... 17

         2.    Lead Plaintiffs' Section 12(a)(2) Claims Are Not Typical
             Of the Proposed Class, Individual Issues Predominate
             And A Class Action Trial Would Be Unmanageable ............ 19

V.    CONCLUSION............................................................................................ 20

    REQUEST FOR ORAL ARGUMENT ....................................................... 21

## TABLE OF AUTHORITIES

**Cases**

Abato v. Marcam Corp.,
162 F.R.D. 8 (D. Mass. 1995) ............................................................................... 10

Adair v. Sorenson,
134 F.R.D. 13 (D. Mass. 1991) .................................................................... 9, 10, 14

Amchem Prods. v. Windsor,
521 U.S. 591 (1997) ............................................................................... passim

Andrews v. Bechtel Power Corp.,
780 F.2d 124 (1st Cir. 1985) ................................................................................. 12

Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.,
238 F.R.D. 679 (S.D. Fla. 2006) ........................................................................... 13

Braun v. N. Ohio Bank,
430 F. Supp. 367 (N.D. Ohio 1977) ...................................................................... 11

DeMaria v. Andersen,
318 F.3d 170 (2d Cir. 2003) .................................................................................. 10

DeRosa v. Mass. Bay Commuter Rail Co.,
694 F. Supp. 2d 87 (D. Mass. 2010) ..................................................................... 12

Duhaime v. John Hancock Mut. Life Ins. Co.,
177 F.R.D. 54 (D. Mass. 1997) ............................................................................. 17

Fletcher v. ZLB Behring LLC,
245 F.R.D. 328 (N.D. Ill. 2006) .............................................................................. 8

Gen. Tel. Co. v. Falcon,
457 U.S. 147 (1982) ................................................................................... 8, 12, 16

Genenbacher v. CenturyTel Fiber Co. II, LLC,
244 F.R.D. 485 (C.D. Ill. 2007) .............................................................................. 8

Gibb v. Delta Drilling Co.,
104 F.R.D. 59 (N.D. Tex. 1984) ............................................................................ 18

Guckenberger v. Boston Univ.,
957 F. Supp. 306 (D. Mass. 1997) ........................................................................ 12

Harden v. Raffensperger, Hughes & Co.,
   933 F. Supp. 763 (S.D. Ind. 1996) ...................................................................... 10

In re Bank of Boston Corp. Secs. Litig.,
   762 F. Supp. 1525 (D. Mass. 1991) ......................................................... 9, 10, 16

In re Fine Host Corp. Secs. Litig.,
   25 F. Supp. 2d 61 (D. Conn. 1998) ............................................................... 10, 11

In re HealthSouth Corp. Secs. Litig.,
   213 F.R.D. 447 (N.D. Ala. 2003) .............................................................. 12, 13, 18

In re New Motor Vehicles Canadian Export Antitrust Litig.,
   522 F.3d 6 (1st Cir. 2008) ........................................................................... 8, 17

In re Organogenesis Secs. Litig.,
   241 F.R.D. 397 (D. Mass. 2007) ................................................................. 12, 16

In re Transkaryotic Therapies, Inc. Secs. Litig.,
   319 F. Supp. 2d 152 (D. Mass. 2004) .......................................................... 10, 11

Isaacs v. Sprint Corp.,
   261 F.3d 679 (7th Cir. 2001) ........................................................................... 8

Kenro, Inc. v. Fax Daily, Inc.,
   962 F. Supp. 1162 (S.D. Ind. 1997) ................................................................. 8

Kent v. SunAmerica Life Ins. Co.,
   190 F.R.D. 271 (D. Mass 2000) ....................................................................... 8

Lee v. Ernst & Young, LLP,
   294 F.3d 969 (8th Cir. 2002) ......................................................................... 10

Mattoon v. City of Pittsfield,
   128 F.R.D. 17 (D. Mass. 1989) ..................................................................... 17

Modell v. Eliot Sav. Bank,
   139 F.R.D. 17 (D. Mass. 1991) ...................................................................... 8, 9

Ostler v. Level 3 Commc'ns, Inc.,
   No. 00-0718, 2002 WL 31040337 (S.D. Ind. Aug. 27, 2002) ................................ 8

Pickett v. Iowa Beef Processors,
   209 F.3d 1276 (11th Cir. 2000) .................................................................. 12, 13

Rosen v. Fidelity Fixed Income Trust,
   169 F.R.D. 295 (E.D. Pa. 1995) .......................................................................................... 19, 20

## Statutes

15 U.S.C. § 77k ........................................................................................................... 1, 10, 20

15 U.S.C. § 77l ................................................................................................................ 1, 11

15 U.S.C. § 77o ...................................................................................................................... 1

15 U.S.C. § 80a-1 et seq. ....................................................................................................... 2

## Other Authorities

17 C.F.R. § 229.512(a)(2) ................................................................................................ 3, 10

17 C.F.R. § 230.145(a) ......................................................................................................... 18

17 C.F.R. § 230.412 ......................................................................................................... 3, 10

17 C.F.R. § 239.15A .............................................................................................................. 2

Fed. R. Civ. P. 23(a)(4) ....................................................................................................... 12

Fed. R. Civ. P. 23(b)(3) .................................................................................................. 17, 20

## I.   __INTRODUCTION__

In their Motion for Class Certification and Incorporated Memorandum of Law ("Motion for Class Certification"), Lead Plaintiffs seek to represent a class of purchasers of the Evergreen Ultra Short Opportunities Fund (the "Fund" or the "Ultra Short Fund") for a period of more than two and a half years with respect to alleged violations of Sections 11, 12(a)(2) and 15[1] of the Securities Act of 1933 (the "1993 Act").  The certification of such an overbroad class is unwarranted and improper for several reasons.

Specifically, Lead Plaintiffs seek to represent a class of shareholders who purchased the Fund between October 28, 2005 and June 18, 2008, despite the fact that no Lead Plaintiff purchased a single share in the Fund until January 2007, nearly fifteen months after the beginning of the proposed class period.  As a result of this fifteen month gap, Lead Plaintiffs do not have standing to represent purchasers over the entire proposed class period.

Even if Lead Plaintiffs have standing to represent purchasers during a portion of the proposed class period, class certification is inappropriate under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").  Specifically, Lead Plaintiffs are not adequate representatives for the proposed class because their interests are antagonistic to a significant portion of the absent putative class members.  Additionally, Lead Plaintiffs' claims are not typical of the proposed class, common questions of law or fact do not predominate and a class action is not a superior method of adjudicating the controversy.  Four of the five Lead Plaintiffs acquired their interest in the Fund as a result of a merger between the Fund and another mutual fund, and, thus, their

---

[1]      15 U.S.C. §§ 77k, 77l, and 77o.  Because Lead Plaintiffs' Section 15 claim is derivative of their claims under Sections 11 and 12(a)(2), Lead Plaintiffs must establish a violation of Section 11 or 12(a)(2) in order to assert their Section 15 claim.  See 15 U.S.C. § 77o.  As a result, Lead Plaintiffs' Section 15 claim should have the same class period as their Section 11 and/or 12(a)(2) claims, if any.  See id.

claims are not typical and are based on questions of law and fact that are distinct from the class members who acquired their Fund shares through purchases.  Finally, Lead Plaintiffs' Section 12(a)(2) claim is not typical and individual issues predominate because the facts underlying the claim would need to be analyzed for every single day that purchases were made during the proposed class period – an individualized, fact-based inquiry that is inappropriate for class treatment.  For the same reason, the Section 12(a)(2) claim would present significant manageability problems at trial.

For these reasons, as explained more fully below, Defendants[2] respectfully request that the Court deny Lead Plaintiffs' Motion for Class Certification with prejudice.

## II.    FACTUAL BACKGROUND

### A.    The Ultra Short Fund.

The Fund[3] was a diversified series of the Trust and was registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the "1940 Act").  15 U.S.C. § 80a-1 et seq.  The Fund was an open-ended mutual fund that offered shares on a continuous basis to the public pursuant to a series of Registration Statements[4] filed with the SEC.

---

[2]      Defendants Evergreen Investment Management Company, LLC ("EIMCO"), Evergreen Investment Services, Inc. ("EISI"), Wachovia Corporation ("Wachovia"), Dennis H. Ferro ("Ferro"), and Kasey Phillips ("Phillips") (collectively, the "Evergreen Defendants"), and Evergreen Fixed Income Trust (the "Trust"), Charles A. Austin III, Shirley L. Fulton, K. Dun Gifford, Leroy Keith, Jr., Gerald M. McDonnell, Patricia B. Norris, William Walt Pettit, David M. Richardson, Russell A. Salton III, Michael S. Scofield, Richard J. Shima and Richard K. Wagoner (collectively, the "Trust Defendants") jointly submit this Opposition.

[3]      The Fund was named the Ultra Short Bond Fund from its inception in June 2003 until August 1, 2005, when it began to be referred to as the Ultra Short Opportunities Fund.  Evergreen Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Class Action Complaint (the "Answer"), Docket No. 36, at ¶ 51-52.

[4]      Pursuant to SEC Form N-1A, a Registration Statement for an open-end mutual fund, such as the Ultra Short Fund, includes three parts:  (1) a Prospectus; (2) a Statement of Additional Information ("SAI"); and (3) other information.  See SEC Form N-1A at p. 7, available at http://www.sec.gov/about/forms/secforms.htm#invcoreg (last visited April 14, 2011); see also 17 C.F.R. § 239.15A.

Answer at ¶ 50.  The Fund was regulated by the 1933 Act and the 1940 Act, which require, <u>inter alia</u>, that the Fund renew its Registration Statement at least once a year by filing a post-effective amendment.  Each time a post-effective amendment becomes effective, it renders the prior Registration Statement obsolete and ineffective as a matter of law.  <u>See</u> 17 C.F.R. § 229.512(a)(2); <u>see also</u> 17 C.F.R. § 230.412.

As would be expected, the disclosures made within the Fund's Registration Statements at issue in this action changed with each post-effective amendment filed during the class period.  Attached to the Transmittal Affidavit of George M. Linge ("Linge Aff."), filed herewith, as Exhibit A is a summary of select disclosures from the Fund's Registration Statements that were effective during the proposed class period.  For example, the risk disclosure related to the Fund's purchases of mortgage-backed securities ("MBS") or mortgage-related investments changed over time.  The Fund's October 28, 2005 Registration Statement did not include a risk disclosure relating specifically to concentration of investments.[5]  Following a change in the Fund's concentration policy that was approved by its shareholders on March 31, 2006, the Fund added the following risk disclosure to the October 26, 2006 Registration Statement:

> The Fund will normally invest more than 25% of its assets in mortgage-backed and other mortgage-related securities (which may include securities that are issued or guaranteed by the U.S. government or its agencies or instrumentalities).  An investment in a fund that concentrates its investments in a single sector or industry entails greater risk than an investment in a fund that invests its assets in numerous sectors or industries.  The Fund may be vulnerable to any financial, economic, political or other developments in its concentration sector or industry

---

[5]     Although the November 1, 2005 Prospectus did not include a risk disclosure relating specifically to concentration of investments, the Fund's Investment Strategy disclosure made clear that the Fund invested a substantial portion of its assets in MBS or mortgage-related securities.  <u>See</u> Linge Aff., Ex. B at EVERGREEN-KEEFE 0006465 ("Under normal circumstances, the Fund will invest at least 80% of its assets, and may invest substantially all of its assets, in commercial and residential fixed and variable rate mortgage-backed securities, including collateralized mortgage obligations (CMOs).  These investments may be issued by private issuers not guaranteed or backed by the credit of the U.S. government or by an agency or instrumentality of the U.S. government.").

that may weaken the sector or industry.   As a result, the Fund's shares may fluctuate more widely in value than those of a fund investing in a number of different sectors or industries.

Linge Aff., Ex. C at EVERGREEN-KEEFE 0006858.  The November 1, 2007 Registration

Statement further refined this risk disclosure language by modifying the above disclosure and

adding additional disclosures:

> The Fund will normally invest more than 25% of its assets in mortgage-backed and other mortgage-related securities (which may include securities that are issued or guaranteed by the U.S. government or its agencies or instrumentalities). *A fund that concentrates its investments in a limited number of sectors, industries, states or countries will be more vulnerable to adverse financial, economic, political or other developments affecting those sectors, industries, states or countries than a fund that invests its assets more broadly, and the value of the fund's shares may be more volatile.*

> *If the Fund purchases mortgage-backed or asset-backed securities that are 'subordinated' to other interests in the same mortgage pool, the Fund as a holder of those securities may only receive payments after the pool's obligations to other investors have been satisfied.  An unexpectedly high rate of defaults on the mortgages held by a mortgage pool may limit substantially the pool's ability to make payments of principal or interest to the Fund as a holder of such subordinated securities, reducing the values of those securities or in some cases rendering them worthless; the risk of such defaults is generally higher in the case of mortgage pools that include so-called 'subprime' mortgages.  An unexpectedly high or low rate of prepayments on a pool's underlying mortgages may have a similar effect on subordinated securities.  A mortgage pool may issue securities subject to various levels of subordination; the risk of non-payment affects securities at each level, although the risk is greater in the case of more highly subordinated securities.*

Linge Aff., Ex. D at EVERGREEN-KEEFE 0007199-7200 (emphasis added).

### B.    The Ultra Short Fund's Liquidation.

The Fund grew from $41 million in reported net assets as of June 30, 2003 to $731

million in net assets as of March 30, 2008.  Answer at ¶ 52.  The Fund's shares were priced at an

NAV of $9.07 per share on June 9, 2008.[6]  Id. at ¶ 119.  On June 19, 2008, the Fund, which had a

total net asset value of approximately $403.8 million, was liquidated, with shareholders of record

as of June 18, 2008 receiving a cash distribution based on a $7.48 per share NAV, calculated at

the close of business on June 18, 2008.  Id. at ¶¶ 8, 117.

Wachovia provided a loan to finance the entire $450 million liquidation of the Fund.

Affidavit of Kasey Phillips, Linge Aff., Ex. E at ¶ 4.[7]  Under the terms of the financing, the

Fund's investments were sold over time (the last sale occurred in December 2009).  Id., Ex. E at ¶

6.  The proceeds from the sales of the Fund's securities were to be used to reimburse Wachovia,

with the Fund's shareholders receiving any proceeds in excess of the loan amount.  Id., Ex. E at ¶

7.  After all of the Fund's securities were sold, however, the proceeds totaled only

$209,962,110.93.  Id., Ex. E at ¶ 8.  Therefore, as a result of the liquidation, Wachovia lost, and

the Fund's shareholders received, approximately $193 million more than the sale of the Fund's

holdings ultimately generated.

**C.      The Regulatory Settlement.**

Shortly after the liquidation of the Fund, the SEC and the Commonwealth of

Massachusetts, Office of the Secretary of the Commonwealth, Securities Division ("Mass.")

launched investigations into the Fund and its liquidation.  After investigations that lasted for

nearly a year, in June of 2009, the SEC and Mass. entered into settlements with EIMCO and

EISI, which resulted in the issuance of orders by the SEC and Mass. (the "Orders" or

---

[6]      As required by the 1940 Act, the Fund calculated its net asset value ("NAV") on a daily basis.  Linge Aff., Ex. B at EVERGREEN-KEEFE 0006470.  The Fund's NAV was calculated by adding up the Fund's total assets, subtracting all liabilities, then dividing the result by the total number of outstanding shares.  Id.

[7]      The $450 million provided by Wachovia included $403.8 million to liquidate the shares of the Fund and $46.2 million to repay amounts outstanding under the Fund's line of credit.  Linge Aff., Ex. E at ¶ 5.

"Regulatory Settlements").[8]  As stated in the Orders, EIMCO and EISI did not admit or deny the factual findings of the SEC or Mass.  Id., Ex. F at pp. 1-2; Ex. G at p. 1.  Pursuant to the SEC Order, among other findings, the SEC found that "[f]rom February 2007 through its closing on June 18, 2008, the Ultra Fund overstated its per share net asset value ('NAV') by as much as 17%."[9]  Id., Ex. F at p. 2.  As a result of the Regulatory Settlements, EIMCO and EISI paid more than $40 million to the Fund's shareholders.[10]  The funds were distributed according to a methodology that was approved by the SEC, which took into account the date that shares were redeemed by each shareholder.  Id., Ex. F at 19.   On a combined basis, Lead Plaintiffs received over $1 million from the Regulatory Settlements.[11]

**D.   Lead Plaintiffs' Claims and Proposed Class.**

After the consolidation of three separate actions and the appointment of the Lead Plaintiffs, Lead Plaintiffs filed their First Amended Class Action Complaint on April 30, 2009 (the "Complaint"), alleging violations of Sections 11, 12(a)(2), and 15 of the 1933 Act, related to alleged losses from their investments in the Fund.  Compl., Docket No. 32-2, at ¶¶ 1-2.  Specifically, Lead Plaintiffs allege that the Fund's Registration Statements/Prospectuses filed

---

[8]      The SEC and Mass. Orders are attached as Exhibits F and G, respectively, to the Linge Aff.

[9]      The SEC Order also found that EIMCO and EISI selectively disclosed material, non-public information and entered into prohibited securities transactions, and that EISI failed to preserve text and instant messages.  Linge Aff., Ex. F at pp. 7-11.

[10]      The total amounts involved in the settlements included:  (1) a civil penalty in the amount of $1,000,000 payable to Mass.; (2) $33,000,000 to compensate shareholders; (3) a civil penalty in the amount of $4,000,000 payable to the SEC; and (4) $2,860,000 in disgorgement plus prejudgment interest of $265,000 paid pursuant to the enforcement action brought by the SEC.  Linge Aff., Ex. F at pp. 15, 22-23; Ex. G at pp. 37-38 & n.4.

[11]      Lead Plaintiffs received the following amounts from the Regulatory Settlements, totaling $1,065,392:  Bricklayers and Allied Craftworkers Local 1 of PA/DE Health and Welfare Fund - $487,318; Bricklayers Local 54 of Pennsylvania Supplemental Welfare Fund - $51,684; International Brotherhood of Electrical Workers Local 98 ("IBEW") - $254,659; NECA Electrical Workers Joint Apprenticeship Training Trust Fund - $198,892; and First Agency Account LP ("First Agency") - $72,840.  See Affidavit of Mark E. Zmijewski ("Zmijewski Affidavit"), Linge Aff. Ex. H at Ex. 2.

with the SEC between October 28, 2005 and June 18, 2008, included the following material

misrepresentations and/or omissions:

> [1] 'The Fund seeks to provide current income consistent with preservation of capital and low principal fluctuation.'
> [2] The 'Fund intends to maintain an average portfolio duration of approximately one year or less.'
> [3] The Fund's investment 'strategy is to seek the highest total return by maximizing income and minimizing price fluctuations…'
> [4] 'The Fund seeks to provide investors with a high level of current income while reducing price volatility.'
> [5] The Fund's performance was benchmarked to the Lehman 6-Month Treasury Bill Index and the Lehman Brothers Government/Credit 0-2.5 Year Index.
> [6] 'The Fund may not invest more than 15% . . . of its net assets in securities that are illiquid'
> [7] The valuation of the Fund's Net Asset Value ('NAV').

Id. at ¶¶ 1, 3. Lead Plaintiffs allege that contrary to the above representations:  (1) "The Fund's

investments were inconsistent with an ultrashort bond fund"; (2) "The Fund's average duration

exceeded one year"; (3) "The Fund was not comparable to similarly titled funds"; (4) "The

Fund's investments were increasingly illiquid"; (5) "The Fund invested in riskier than

represented mortgage-backed securities"; and (6) "The Fund's NAV was overstated."  Id. at ¶ 4.

On February 15, 2011, Lead Plaintiffs filed their Motion for Class Certification, in which

they seek to represent "a class consisting of all persons or entities who purchased or acquired

shares of the Evergreen Ultra Short Opportunities Fund . . . between October 28, 2005 and June

18, 2008, inclusive, and who were damaged thereby" (the "Proposed Class").[12]  Mot. for Class

---

[12]     In their Complaint, Lead Plaintiffs sought to represent a class consisting "of all persons or entities who purchased or acquired shares of the Evergreen Ultra Short Opportunities Fund . . . between October 28, 2005 and June 18, 2008[.]"  Compl. at ¶ 1.  Now in their Motion for Class Certification, Lead Plaintiffs seek to represent "a class consisting of all persons or entities who purchased or acquired shares of the Evergreen Ultra Short Opportunities Fund . . . between October 28, 2005 and June 18, 2008, inclusive, *and who were damaged thereby.*"  Mot. for Class Certification at p. 1 (emphasis added).  To the extent that Lead Plaintiffs intend to include the additional language "*and who were damaged thereby*" in their class definition, Lead Plaintiffs' Motion for Class Certification should be denied because an individual liability determination must be made, i.e., whether a Fund purchaser was damaged, in order to determine which persons are members of the Proposed Class.  Other courts have

Continued on following page

Certification, Docket No. 66, at p. 1.  Excluded from the Proposed Class are the named

Defendants, as well as "any entity in which Defendants or any excluded person has or had a

controlling interest, the officers and directors of the corporate defendants, and the legal affiliates,

representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of

any such excluded party."[13]  Id. at p. 1, n.1.

## III.   <u>LEGAL STANDARD</u>

In order to establish that class certification is appropriate, the plaintiff bears the burden to

establish that each of the four requirements of Rule 23(a) and one of the requirements of Rule

23(b) have been satisfied.  <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 522 F.3d

6, 18-19 (1st Cir. 2008); <u>Modell v. Eliot Sav. Bank</u>, 139 F.R.D. 17, 19 (D. Mass. 1991).  In

determining whether a plaintiff has met his burden, the court must conduct a "rigorous analysis"

of the Rule 23 criteria.  <u>Kent v. SunAmerica Life Ins. Co.</u>, 190 F.R.D. 271, 276 (D. Mass 2000).

To satisfy this "rigorous analysis" standard, the plaintiff must provide the court with "*actual, not*

*presumed*, conformance with [the] Rule 23(a)" requirements.  <u>Gen. Tel. Co. v. Falcon</u>, 457 U.S.

147, 160 (1982) (emphasis added).  Furthermore, this "rigorous analysis" must include a careful

consideration of plaintiffs' allegations and of the evidence relating to the merits, to the extent

that the merits overlap with the requirements of Rule 23. <u>In re New Motor</u>, 522 F.3d at 24.

---

Continued from previous page

rejected class certification where, like Lead Plaintiffs here, the plaintiffs seek to define a proposed class in a way that is dependent upon an individual's ability to maintain a prima facie merits claim (i.e., proposes an impermissible "fail-safe" class definition).  <u>Ostler v. Level 3 Commc'ns, Inc.</u>, No. 00-0718, 2002 WL 31040337, at *2 (S.D. Ind. Aug. 27, 2002); <u>see also</u> <u>Isaacs v. Sprint Corp.</u>, 261 F.3d 679, 681-82 (7th Cir. 2001); <u>Genenbacher v. CenturyTel Fiber Co. II, LLC</u>, 244 F.R.D. 485, 487-88 (C.D. Ill. 2007); <u>Fletcher v. ZLB Behring LLC</u>, 245 F.R.D. 328, 334-35 (N.D. Ill. 2006); <u>Kenro, Inc. v. Fax Daily, Inc.</u>, 962 F. Supp. 1162, 1169-70 (S.D. Ind. 1997).

[13]     Plaintiffs' proposed class definition thus excludes all Evergreen or Wachovia entities or affiliates that were invested in the Fund, such as certain Evergreen Envision Funds and the Wachovia Stable Value Funds, which at the time of the Fund's June 2008 liquidation held, on a combined basis, more than 35% of the Fund's outstanding shares.  Linge Aff., Ex. H at p. 9, n.24.

As discussed below, the Court should first consider Lead Plaintiffs' lack of standing to represent the entire Proposed Class period before addressing the Rule 23 criteria. However, after the Court considers the standing issues and turns to Rule 23, it will be apparent that Lead Plaintiffs have failed to carry their burden of establishing that class certification is appropriate because: (1) Lead Plaintiffs cannot fairly and adequately represent the Proposed Class; (2) Lead Plaintiffs' claims are not typical of the Proposed Class; (3) individual issues predominate; and (4) a class action trial would not be manageable. Accordingly, Lead Plaintiffs' Motion for Class Certification should be denied.

## IV.   ARGUMENT

### A.   Lead Plaintiffs Do Not Have Standing To Represent The Entire Proposed Class Period.

Before a court can address whether a plaintiff meets the class certification requirements of Rule 23, "it must answer a threshold question: Do each of the named plaintiff representatives have *standing* to assert the claims for which each class seeks to recover?" In re Bank of Boston Corp. Secs. Litig., 762 F. Supp. 1525, 1531 (D. Mass. 1991) (emphasis in original); see also Modell, 139 F.R.D. at 20; Adair v. Sorenson, 134 F.R.D. 13, 16 (D. Mass. 1991). Indeed, "[a] federal district court may not permit a plaintiff to circumvent the standing requirement simply because the plaintiff files his suit as a class action." Bank of Boston, 762 F. Supp. at 1531 (citation omitted). As this court has recognized, "[s]trict standing requirements are particularly important in the area of securities litigation, in order to curb the risks of vexatious litigation and abuse of discovery." Id. A court must assess the limitations of the named plaintiffs' standing, and limit the class or the class period accordingly. Id.; see also Modell, 139 F.R.D. at 21-22; Adair, 134 F.R.D. at 16. Finally, "when the issue of standing is raised by a party, the Court must

resolve that issue <u>before</u> considering the class certification requirements under Rule 23."  <u>Bank</u>

<u>of Boston</u>, 762 F. Supp. at 1531 (<u>citing</u> <u>Adair</u>, 134 F.R.D. at 16 n.3) (emphasis in original).[14]

**1.** **Lead Plaintiffs Do Not Have Standing Under Sections 11 Or 12(a)(2) To Represent Ultra Short Fund Shareholders Who Purchased Prior To October 26, 2006.**

A plaintiff suing under Section 11 must have purchased shares pursuant to or traceable to

a particular, allegedly defective registration statement.  15 U.S.C. § 77k; <u>Lee v. Ernst & Young,</u>

<u>LLP</u>, 294 F.3d 969, 976-77 (8th Cir. 2002).[15]  Indeed, in their Complaint, Lead Plaintiffs

acknowledge this tracing requirement.  <u>See</u> Compl. at ¶ 125 ("Plaintiffs acquired shares in the

Fund pursuant to or traceable to <u>each</u> of the Registration Statements.") (emphasis added).

As stated above, each time a new registration statement becomes effective for a mutual

fund, it renders the prior registration statement obsolete and ineffective as a matter of law.[16]

Thus, under Section 11, Lead Plaintiffs only have standing to sue with respect to the Fund for

alleged misrepresentations or omissions contained in the Registration Statements that were

effective at the time of their purchases.  15 U.S.C. § 77k; <u>Lee</u>, 294 F.3d at 976-77; <u>supra</u> note 15.

The standing analysis is the same under Section 12(a)(2).  Under Section 12(a)(2), a plaintiff

---

[14] When determining whether a plaintiff has standing, a court must not allow itself to be sidetracked into an analysis of whether a plaintiff is typical of the class under Rule 23.  As this Court held in <u>Adair</u>: "Cases cited by plaintiff in support of plaintiffs' 'standing' to bring suit are inapposite.  These cases address the issue of 'typicality' and do not address the plaintiffs' 'standing.'  Courts have recognized the 'common course of conduct' theory by construing the 'typicality' requirement of Rule 23. . . . [t]he issue of standing, however, must be overcome before the Court considers the typicality of claims required by Rule 23."  <u>Adair</u>, 134 F.D.R. at 16 n.3; <u>see also</u> <u>Abato v. Marcam Corp.</u>, 162 F.R.D. 8, 11 (D. Mass. 1995) (citing <u>Adair</u> for the proposition that cases addressing typicality are inapplicable to the question of standing).

[15] <u>See also</u> <u>DeMaria v. Andersen</u>, 318 F.3d 170, 176 (2d Cir. 2003); <u>In re Transkaryotic Therapies, Inc. Secs. Litig.</u>, 319 F. Supp. 2d 152, 158-59 (D. Mass. 2004); <u>In re Fine Host Corp. Secs. Litig.</u>, 25 F. Supp. 2d 61, 66-67 (D. Conn. 1998); <u>Harden v. Raffensperger, Hughes & Co.</u>, 933 F. Supp. 763, 766 (S.D. Ind. 1996).

[16] <u>See</u> 17 C.F.R. § 229.512(a)(2) ("for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein"); <u>see also</u> 17 C.F.R. § 230.412.

- 10 -

only has standing to sue the entity that sold him the security pursuant to the prospectus effective at the time of purchase that contains an untrue statement or omission of material fact.  See 15 U.S.C. § 77l(a)(2).[17]

Lead Plaintiffs' Proposed Class seeks to include those who purchased shares in the Fund between October 28, 2005 and June 18, 2008.  However, Lead Plaintiffs do not have standing to represent such an expansive class.  Discovery in this case has revealed that Lead Plaintiffs' first purchase of Fund shares was made by First Agency on January 24, 2007.  See Linge Aff., Ex. I.[18] Four Registration Statements were filed and made effective during the Proposed Class period.[19] Lead Plaintiffs' earliest purchases, made in January 2007, were purchased pursuant to or traceable to the October 26, 2006 Registration Statement.  Because Lead Plaintiffs did not purchase any shares in the Ultra Short Fund until January 2007, they do not have standing under Section 11 or 12(a)(2) to represent any persons who purchased shares in the Fund pursuant to or traceable to the 2005 Registration Statement, or prior to October 26, 2006.

### B.    Lead Plaintiffs Are Not Adequate Class Representatives.

Even if Lead Plaintiffs have standing to represent purchasers during a portion of the Proposed Class period, they have failed to meet their burden of establishing, under Rule 23, that

---

[17]    See also Braun v. N. Ohio Bank, 430 F. Supp. 367, 373 (N.D. Ohio 1977) ("It is apparent from the words... 'the person purchasing such security' (§ 12) that these sections only create causes of action in favor of buyers of the security to which the representations immediately relate.") (emphasis in original); In re Transkaryotic, 319 F. Supp. 2d at 158; In re Fine Host, 25 F. Supp. 2d at 67.

[18]    Although IBEW declared under penalty of perjury in their Lead Plaintiff Certification that they purchased shares in the Fund on September 22, 2005 and November 6, 2006, discovery has revealed that the IBEW first acquired shares in October 2007 when the Evergreen Limited Duration Fund, in which they owned shares, merged with the Ultra Short Fund.  Compare Linge Aff., Ex. J, with Linge Aff., Ex. K at p. 4.

[19]    Registration Statements:  (1) filed and made effective on October 28, 2005 ("2005 Registration Statement"); (2) filed and made effective on October 26, 2006 ("2006 Registration Statement"); (3) Form N-14/A filed on July 20, 2007, and made effective on July 26, 2007 ("July 2007 Registration Statement"); and (4) filed on October 26, 2007, and made effective on November 1, 2007 ("November 2007 Registration Statement").

class certification is appropriate.  Under Rule 23, a class can only be certified when the lead plaintiffs "will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4); In re Organogenesis Secs. Litig., 241 F.R.D. 397, 406 (D. Mass. 2007).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997) (citing Gen. Tel., 457 U.S. at 157-58, n.13).  Thus, in order to establish that they are adequate class representatives, Lead Plaintiffs must show that their interests will not conflict with the interests of the class members.  DeRosa v. Mass. Bay Commuter Rail Co., 694 F. Supp. 2d 87, 100 (D. Mass. 2010) (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)).  The adequacy requirement of Rule 23 bars proposed Lead Plaintiffs from representing the interests of absent class members if "any potential conflicts exist between the named plaintiffs and the prospective class members." Guckenberger v. Boston Univ., 957 F. Supp. 306, 326 (D. Mass. 1997) (citations omitted).

### 1.    A Significant, Irreconcilable Conflict Exists Between Lead Plaintiffs And Absent Putative Class Members.

It is axiomatic that a "class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." Amchem, 521 U.S. at 625 (1997) (citations omitted).  Indeed, courts have held that it is improper to certify a class, under Rule 23, when the putative class "members have opposing interests *or when [the class] consists of members who benefit from the same acts alleged to be harmful to other members of the class*." In re HealthSouth Corp. Secs. Litig., 213 F.R.D. 447, 463 (N.D. Ala. 2003) (quoting Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)) (emphasis in original).  In HealthSouth, the court denied plaintiffs' motion for class certification where the proposed class included HealthSouth Shareholders who fell into two, conflicted groups: (1) shareholders who

benefitted from HealthSouth's allegedly inflated stock price; and (2) shareholders who were harmed by HealthSouth's allegedly inflated stock price.  Id. at 462.  Specifically, the proposed class included: (1) shareholders who purchased HealthSouth stock on the open market and benefitted when HealthSouth financed two mergers, at least partially, with its allegedly inflated shares; and (2) shareholders who received HealthSouth stock in exchange for their ownership interest in the merged companies and, thus, were harmed by the allegedly inflated share price.  Id.  The HealthSouth court denied class certification because the fundamental conflict between the two groups was "too great to ignore and negate[d] the adequacy of representation."  Id. at 463; Amchem, 521 U.S. at 625-628 (affirming court of appeal's judgment denying class certification in part due to irreconcilable conflict between class members).[20]

Like Amchem, HealthSouth, Pickett and Boca, Lead Plaintiffs' Motion for Class Certification should be denied due to the presence of a significant, irreconcilable conflict.  As stated above, supra pp. 6-7, Lead Plaintiffs' Section 11 and 12(a)(2) claims are premised on alleged misrepresentations related to: (1) the Fund's individual holdings; (2) the Fund's duration; (3) a comparison of the Fund to its stated benchmark; (4) the liquidity of the Fund's investments; (5) the risk of the individual MBS held by the Fund; and (6) the Fund's daily NAV.  Compl. at ¶ 4; Mot. for Class Certification at pp. 1-2.  Lead Plaintiffs' claims fall into two categories: (a) claims related to the nature of the investments held in the Fund ("Investment Claims"), which include Plaintiffs' allegations (1) through (5), above; and (b) claims related to the mispricing of

---

[20]     See also Pickett, 209 F.3d at 1280-81 (reversing trial court's granting of motion for class certification because "the [proposed] class includes those who claim harm from the very same acts from which other members of the class have benefitted"); Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp., 238 F.R.D. 679, 695-98 (S.D. Fla. 2006) (denying motion for class certification, in part, because various putative class members, who benefitted from the same acts which harmed other class members, would stand to gain more from different possible liability theories than those proposed by lead plaintiffs).

the Fund's NAV ("Mispricing Claims"), which include Plaintiffs' allegation (6), above.   Linge

Aff., Ex. H (Zmijewski Affidavit) at p. 9, ¶ 19.

    With respect to Lead Plaintiffs' Mispricing Claims, there is a fundamental conflict

between putative class members.  In any case involving the mispricing of a mutual fund's shares,

certain shareholders likely will benefit from the mispricing while other shareholders likely will

be harmed.  See Linge Aff., Ex. F at p. 2, ¶ 1; p. 7, ¶ 14.  For example, if the NAV of a mutual

fund is overvalued, shareholders who redeem their shares during the period of the overvaluation

will receive more money than their shares are actually worth – to the detriment of the mutual

fund and the remaining shareholders.  Id.  Conversely, investors who purchase shares during the

period of misvaluation will pay more money than the shares are actually worth.  Id.  If the claims

of all the shareholders during the overvaluation period were aggregated into a class action,

however, a classic conflict would exist: shareholders who were harmed by the overvaluation

would want to pursue misvaluation claims, while shareholders who benefitted from the

misvaluation would not.  Indeed, proof of any misvaluation would raise the possibility that

shareholders who benefitted from the misvaluation would be required to return the amount of

their benefit to the fund, or at a minimum have their potential damages reduced by the amount of

the benefit they enjoyed due to the overvaluation.

    The SEC Order and the resulting distribution of the settlement money to the Fund's

shareholders illustrate this conflict.  Although not admitted or denied by EIMCO or EISI as part

of the Regulatory Settlements, the SEC found that "[f]rom February 2007 through its closing on

June 18, 2008, the Ultra Fund overstated its per share net asset value ('NAV') by as much as

17%."  Supra p. 6.  The SEC Order further provided that the amount of compensation to be paid

to those harmed by this mispricing would be determined utilizing a "methodology" that had been

"reviewed and approved by the Commission staff." Id., Ex. F at p. 19.  Dr. Mark E. Zmijewski

of Navigant Economics was retained to measure the effect of this mispricing on individual

investors.  Dr. Zmijewski determined that certain putative class members who purchased shares

in the Fund prior to February 2007 and sold their shares during the mispricing period **benefitted**

because they received more money at the time of sale than they would have received had the

NAV not been mispriced.  Linge Aff., Ex. H at pp. 8-9, ¶ 17, pp. 9-10, ¶ 20; see also Ex. F at p.

2, ¶ 1; p. 7 ¶ 14.  Moreover, according to Dr. Zmijewski, not only did these putative class

members receive more money than they should have, but their **gain** was at the **direct expense** of

the Fund and its shareholders, such as Lead Plaintiffs, who were harmed by the mispricing.  Id.

Dr. Zmijewski further concluded that the number of Fund shareholders who benefitted from the

mispricing was quite significant.  According to his findings, 48% of the putative class members

who purchased Fund shares during the period addressed by the SEC Order (February 2007

through June 18, 2008) benefitted from the mispricing of the Fund's NAV found by the SEC.

Linge Aff., Ex. H at pp 13-14, ¶ 28.

In light of Dr. Zmijewski's conclusions, the conflict among the putative class members

here is obvious.  The putative class members who benefitted from any mispricing of the Fund's

NAV have no incentive to pursue the Mispricing Claims and, instead, have an interest in

focusing solely on those claims that do not involve allegations of mispricing; i.e., the Investment

Claims.  Id., Ex. H at pp. 10-14, ¶¶ 23-28.  In fact, such putative class members have a strong

incentive not to pursue mispricing claims, because proof of such claims may eliminate or reduce

the potential damages available to them from the Investment Claims.  See Answer, at p. 17

(raising defense that Plaintiffs' claims "are barred or fail, in whole or in part, to the extent that

Plaintiffs benefitted from any alleged misvaluation of the Fund's investments.")  On the other

hand, the shareholders who were harmed by any mispricing of the Fund's NAV have an incentive to pursue the Mispricing Claims.   Linge Aff., Ex. H at pp. 10-14, ¶¶ 23-28.

In addition, according to Dr. Zmijewski, not one of the five Lead Plaintiffs benefitted, on a net basis, from the mispricing of the Fund's NAV found by the SEC, as evidenced by their receipt of payments from the Regulatory Settlements.  Supra note 11; Linge Aff., Ex. H at p. 14, ¶¶ 29-30, Ex. 2.  As a result, no Lead Plaintiff can adequately represent the interests of those absent class members who benefitted from any mispricing of the Fund's NAV and do not have an interest in pursuing the Mispricing Claims.  Id.

Because clear, irreconcilable conflicts exist among the different types of putative class members, Lead Plaintiffs are not adequate class representatives.[21]

    **C.**    **Lead Plaintiffs Claims Are Not Typical Of The Claims Of The Class, Common Issues Do Not Predominate, And A Class Action Is Not A Superior Method of Adjudicating This Matter.**

In order to establish typicality, a plaintiff must demonstrate that the claims or defenses of the proposed class representatives are typical of the class as a whole. In re Organogenesis, 241 F.R.D. at 400-01.  A proposed class representative is not typical when he or she must prove facts to establish his or her case that are different from the other members of the class.  See Bank Boston, 762 F. Supp. at 1532-33.  In such instances, class certification should be denied.  Id.

Additionally, Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the

---

[21]    The Rule 23 requirements of typicality and adequacy-of-representation often overlap.  See Gen. Tel., 457 U.S. at 157 n.13.  As a result, the conflicts between the putative class members described above, also render Lead Plaintiffs' claims not typical of the absent class members, such that Plaintiffs' Motion for Class Certification should be denied for this reason as well.  See id.

controversy." Fed. R. Civ. P. 23(b)(3).  One of the factors pertinent to the court's Rule 23(b)

analysis is "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).[22]

The predominance inquiry mandated by Rule 23(b)(3) "tests whether [a] proposed class

[is] sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623.

Finding that common issues exist is insufficient; rather, the court must perform a more

"demanding inquiry" to determine whether commonality *predominates*. Id. at 623-24; see also

In re New Motor Vehicles, 522 F.3d at 20.  Under this more demanding inquiry, common

questions must outweigh the individual questions in terms of quantity and quality.  See Mattoon

v. City of Pittsfield, 128 F.R.D. 17, 20 (D. Mass. 1989).

Rule 23(b)(3) also requires that a class action be superior to any other available means of

adjudication. "This provision is intended to permit class actions that would 'achieve economies

of time, effort, and expense[.]'" Duhaime v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54, 65

(D. Mass. 1997) (quoting Amchem, 521 U.S. at 615).

As explained below, Lead Plaintiffs' Motion for Class Certification should be denied

because: (1) Lead Plaintiffs' claims are not typical; (2) common issues do not predominate; and

(3) a class action trial would be unmanageable.

**1.     Lead Plaintiffs' Claims Are Not Typical And Individual Issues
Predominate Because Different Circumstances Surround Class
Members' Acquisitions Of Shares In The Ultra Short Fund.**

Four of the five Lead Plaintiffs acquired their interest in the Fund pursuant to the July

2007 Registration Statement that was filed and made effective in connection with the merger

---

[22]     Under Rule 23(b)(3), the court may also consider: "(A) the class members' interests in individually
controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the
controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the
litigation of the claims in the particular forum . . . ." Fed. R. Civ. P. 23(b)(3).

between the Evergreen Limited Duration Fund (the "Limited Duration Fund") and the Fund.[23]

Indeed, the July 2007 Registration Statement only applied to investors who acquired their

interest in the Fund pursuant to the Limited Duration Fund merger, and the July 2007

Registration Statement contained unique and additional disclosures that were not included in the

other Registration Statements at issue.  Linge Aff., Ex. A.[24]

Courts have held that class certification should be denied when putative class members'

1933 Act claims were being asserted by certain lead plaintiffs who acquired their interest in the

security at issue pursuant to a merger/exchange offer, as opposed to a purchase.  See, e.g.,

HealthSouth, 213 F.R.D. at 459-60.[25]  Because Lead Plaintiffs' Proposed Class includes putative

class members who acquired their interest in the Ultra Short Fund both as a result of the Limited

Duration Fund merger and as a result of purchases, Lead Plaintiffs' claims lack typicality and

individual issues predominate.  See id.[26]

---

[23]     See Linge Aff., Ex. K at p. 4; Ex. L at p. 4; Ex. M at p. 4; Ex. N at p. 4.  The merger between the Limited Duration Fund and the Fund was structured as an exchange offer.  See Linge Aff., Ex. O at Article 1.1, EVERGREEN-KEEFE 0005724.

[24]     The July 2007 Registration Statement was first filed on June 22, 2007, and then amended and re-filed on July 20, 2007.  The July 2007 Registration Statement was issued in conjunction with the proposed merger of the Evergreen Limited Duration Fund and the Ultra Short Fund and, although not identified as such by Lead Plaintiffs in their Complaint, constitutes a separate Registration Statement under the 1933 Act and 1940 Act.  See SEC Form N-14, available at http://www.sec.gov/about/forms/secforms.htm#invcoreg (last visited April 14, 2011); see also 17 C.F.R. 230.145(a).

[25]     In HealthSouth, the proposed class asserted claims under Sections 11 and 15 of the 1933 Act and Sections 10(b), and Rule 10(b)-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934.  213 F.R.D. at 454.  Importantly, the HealthSouth court denied class certification as to all of the claims asserted due to a lack of typicality.  Id. at 459-60

[26]     Supra note 21.  The fact that certain class members acquired their interest in the Ultra Short Fund through the Limited Duration Fund merger and others acquired their interest through purchases in the Fund also renders Lead Plaintiffs inadequate to represent the class.  See HealthSouth, 213 F.R.D. at 461-63; Gibb v. Delta Drilling Co., 104 F.R.D. 59, 78-82 (N.D. Tex. 1984).

**2.      Lead Plaintiffs' Section 12(a)(2) Claims Are Not Typical Of The Proposed Class, Individual Issues Predominate And A Class Action Trial Would Be Unmanageable.**

In order to prevail on a Section 12(a)(2) claim, a plaintiff must prove that the prospectus in effect when he purchased his shares contained an untrue statement or omission of fact that was material as of the date he made his purchase.  <u>Rosen v. Fidelity Fixed Income Trust</u>, 169 F.R.D. 295, 299 (E.D. Pa. 1995).   In <u>Rosen</u>, the plaintiff filed suit against a mutual fund that invested in fixed income debt securities, alleging violations of Sections 11, 12(2)[27] and 15 of the 1933 Act. <u>Id.</u> at 296.  The court addressed the difficulty of proving a Section 12(a)(2) case against a mutual fund with a constantly changing portfolio:

> For the putative class members to recover under § 12[(a)](2), a material misrepresentation must have existed *at the time of each party's purchase*. Because the makeup of the Fund's portfolio is different at any given moment, and because the Defendants' intent, goals and strategy may change from time to time, each putative class member's case will require proof of facts unique to that individual. . . . Certification of the § 12[(a)](2) class would place Plaintiff in the untenable position of having to investigate the financial history of the Fund over the entire period that the [prospectuses] were in force; the purposes of this investigation would be to determine the makeup of the Fund's portfolio and the investment strategies of the Defendants at practically every point during that three and one-half year term.

<u>Id.</u> at 299-300 (emphasis added).  The court denied class certification because the "fundamental non-alignment of claims" would place the interests of the absent class members at risk.  <u>Id.</u>

The present case is directly on point with <u>Rosen</u>.  Lead Plaintiffs' Section 12(a)(2) claims are premised on alleged misrepresentations in the Fund's Prospectuses related to: the Fund's individual holdings and duration; a comparison of the Fund to its stated benchmark; the liquidity and risks of the Fund's investments; and the Fund's daily NAV.  <u>Supra</u> pp. 6-7.  During the class

---

[27]      The Private Securities Litigation Reform Act of 1995 added a loss causation defense to Section 12, causing Section 12(2) to be renamed Section 12(a)(2).

period, the Fund's holdings and duration, and the liquidity and risk of the Fund's individual

holdings, changed over time.  Indeed, discovery has confirmed that the Fund's duration was

analyzed multiple times per week, and determinations as to the liquidity of the Fund's individual

holdings were made on a monthly basis.  Linge Aff., Ex. P; Ex. Q.  Furthermore, as explained

above, the Fund's disclosures changed with each post-effective amendment.  Supra pp. 3-4;

Linge Aff., Ex. A.  The certification of a Section 12(a)(2) class in this case, like Rosen, would

require Lead Plaintiffs to determine the characteristics of the Fund at issue – i.e., duration,

liquidity, holdings, etc. – and analyze the applicable disclosures, which changed with each

Registration Statement, and the available information in the marketplace at practically every

point during the class period.  Therefore, pursuant to Rosen, Lead Plaintiffs' Section 12(a)(2)

claims are not sufficiently typical of the putative class to protect the interests of the absent class

members.  Rosen, 169 F.R.D. at 300.  Furthermore, under Rule 23(b), Lead Plaintiffs' Section

12(a)(2) claims are not suitable for class treatment because: (1) individual issues predominate;

and (2) a class action trial would be unmanageable.[28]  See Fed. R. Civ. P. 23(b)(3).[29]

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Lead

Plaintiffs' Motion for Class Certification with prejudice.

---

[28]    Defendants do not make this same argument under Section 11 because, pursuant to that Section, a plaintiff must prove that the Registration Statement was materially misleading on the date that it became effective, not on the date that the plaintiff purchased his shares.  See 15 U.S.C. § 77k; see also Rosen, 169 F.R.D. at 299.

[29]    Lead Plaintiffs have alleged in their Motion for Class Certification that their claims "arise out of the same course of conduct as the Class claims and are premised on the same legal theory."  Mot. for Class Certification at p. 13.  This argument misses the mark in this case, where the Prospectus disclosures, as well as the underlying markets for the assets at issue, changed notably over the class period.  See Linge Aff., Ex. A.  In this case, as in Rosen, the facts changed with such frequency that no Lead Plaintiff can be typical of the class over the entire Proposed Class period.

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1(d), Defendants request oral argument at a date and time to be set by this Court.

Dated: April 15, 2011                     Respectfully Submitted,

REED SMITH LLP

By:   _/s/ George M. Linge_____
    George M. Linge, BBO #648199
    Thomas L. Allen, admitted pro hac vice
    Joseph P. Pohl III, admitted pro hac vice
    Justin J. Kontul, admitted pro hac vice
    225 Fifth Avenue
    Suite 1200
    Pittsburgh, PA  15222
    (412) 288-3131
    glinge@reedsmith.com
    tallen@reedsmith.com
    jpohl@reedsmith.com

    *Counsel for Evergreen Investment
    Management Co. LLC, Evergreen
    Investment Services, Inc., Wachovia
    Corporation, Dennis H. Ferro and
    Kasey Phillips*

ROPES & GRAY LLP

By:   _/s/ Abraham R. George_____
    Robert G. Jones BBO #630767
    Abraham R. George BBO #668949
    ROPES & GRAY LLP
    One International Place
    Boston, MA 02110-2624
    (617) 951-7000
    Robert.Jones@ropesgray.com
    Abraham.George@ropesgray.com

    *Counsel for Evergreen Fixed Income Trust,
    Charles A. Austin, Shirley L. Fulton, K. Dun
    Gifford, Leroy Keith, Jr., Gerald M.
    McDonnell, Patricia B. Norris, William
    Walt Pettit, David M. Richardson, Russell A
    Salton III, Michael S. Scofield, Richard J.
    Shima, and Richard K. Wagoner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed on April 15, 2011 through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by U.S. Mail to those identified non-registrants on the date of filing.

*/s/  George M. Linge*