UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re EVERGREEN ULTRA SHORT OPPORTUNITIES FUND SECURITIES LITIGATION | ) ) ) ) | Master File No. 1:08-cv-11064-NMG <br><br> CLASS ACTION |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) ) | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

## I.  INTRODUCTION

Lead Counsel, Robbins Geller Rudman & Dowd, Cohen Placitella & Roth, P.C., and Evangelista & Associates, LLC on behalf themselves and Lead Plaintiffs, Evergreen Investor Group[1] and the Bricklayers Group[2] ("Lead Plaintiffs"), respectfully submit this Memorandum of Law in Support of their request for an Award of Attorneys' Fees and Reimbursement of Expenses pursuant to 15 U.S.C. §77z-1(a)(4) in connection with the proposed Settlement of this securities class action.

Pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, Lead Counsel respectfully request this Court enter an order: (1) awarding attorneys' fees in the amount of thirty percent (30%) of the Settlement Fund; (2) awarding Lead Counsel $798,277.56 in expenses in connection with prosecuting and resolving the Litigation; (3) granting Court-appointed Lead Plaintiffs' application for an award from the Settlement Fund, pursuant to 15 U.S.C. §77z-1(a)(4) for their time and expenses; and (4) awarding interest on these amounts at the same rate and for the same periods as earned by the Settlement Fund until paid.  The requested attorneys' fees are reasonable under pertinent factors assessed by courts in this Circuit, including the risk of nonpayment, the time and labor required, the novelty and difficulty of the factual and legal issues, the amount involved and the results obtained, and the experience and skill of class counsel.  They also fall comfortably within the range of fees that is customarily sought by, and awarded to, experienced counsel in similar contingent-fee litigation in this Circuit and elsewhere.

---

[1]    The Evergreen Investor Group is comprised of International Brotherhood of Electrical Workers Local 98, NECA Electrical Workers Joint Apprenticeship Training Trust Fund and First Agency Account LP.

[2]    The Bricklayers Group is comprised of the Bricklayers and Allied Craftworkers Local 1 of PA/DE Health and Welfare Fund and the Bricklayers Local 54 of Pennsylvania Supplemental Welfare Fund.

The reasonableness of the requested fee is further supported by performing a lodestar "cross-check." Plaintiffs' Counsel spent approximately 7,039.10 hours and incurred a total "lodestar" of $4,601,270.00 (*i.e.*, the value of the hours spent in connection with the Litigation if paid at current hourly rates) in order to bring the Litigation to a successful resolution. Thus, a thirty percent award, under the preferred "percentage-of-fund" basis for awarding fees, is only slightly above Lead Plaintiffs' Counsel's actual lodestar. This relatively small multiplier of lodestar is appropriate in view of the risks undertaken by Lead Counsel in pursuing the claims asserted, the work performed, and the results achieved for the benefit of the Class, as described herein.

For the all of the reasons set forth herein and detailed in the Joint Declaration[3], Lead Counsel request that this motion for attorneys' fees and expenses be granted.

## II.    ARGUMENT

### A.    This Motion Is Consistent with the Common Fund Doctrine

For more than a century, the Supreme Court has recognized the "common fund" exception to the general rule that a litigant bears his or her own attorney's fees. *Trustees v. Greenough*, 105 U.S. 527 (1882); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 125 (1885). The Supreme Court explained the rationale for the common fund principle in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980):

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole . . . . Jurisdiction over the fund involved in the litigation allows a court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

---

[3]    *See* the accompanying Declaration of Stewart L. Cohen and Jack Reise in Support of Approval of the Proposed Settlement, Award of Attorneys' Fees and Reimbursement of Expenses, and Plan of Allocation of Settlement Proceeds, pursuant to 15 U.S.C. §77z-1(a)(4) ("Joint Decl.").

*See also In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249, 265 (D.N.H. 2007) ("By assessing attorneys' fees and litigation expenses against a common fund, the court spreads these costs proportionately among those benefitted by the suit.") (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

The common fund doctrine prevents unjust enrichment while encouraging counsel to protect the rights of persons having relatively small claims.  *See In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n. 6 (1st Cir. 1995) ("The common fund doctrine is founded on the equitable principle that those who have profited from litigation should share its costs.").  Lead Counsel's motion is fully consistent with this well-established precedent.

### B.    The First Circuit Favors the Percentage-of-Fund Method in Awarding Attorneys' Fees in Common Fund Cases

Courts generally favor awarding fees from a common fund based upon the percentage of-the-fund method.  *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) (stating that in common fund cases "a reasonable fee is based on a percentage of the fund bestowed on the class").  The First Circuit held in *Thirteen Appeals*, 56 F.3d 295, that district courts retain discretion in common fund cases to calculate counsel fees either on a percentage-of-fund, or "POF," basis or by using the lodestar method.  The court stated, however, that use of the lodestar method in common fund cases "breaks from precedent," *id.* at 305, and that "[o]ur decision is driven by our recognition that use of the POF method in common fund cases is the prevailing practice and by the distinct advantages that the POF method can bring to bear in such cases."  *Id.* at 307; *see also Nilsen v. York County*, 400 F. Supp. 2d 266, 270-71 (D. Me. 2005) ("As between the two methods, the First Circuit has noted that the percentage-of-funds method is the prevailing practice, and that it may have distinct advantages over the lodestar approach.").

Among the advantages recognized by the First Circuit was the fact that the percentage-of-fund method is less burdensome to administer than the lodestar method, which "forc[es] the judge to

review the time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended." *Thirteen Appeals*, 56 F.3d at 307.  Rather, the First Circuit stated, "the POF method permits the judge to focus on 'a showing that the fund conferring a benefit on the class resulted from' the lawyers' efforts." *Id.* (quoting *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)).  The First Circuit also acknowledged that the "shift in focus lessens the possibility of collateral disputes that might transform the fee proceeding into a second major litigation." *Thirteen Appeals*, 56 F.3d at 307; *see also In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 77-78 (D. Mass. 2005) (concluding, based on *Thirteen Appeals*, that percentage method is most appropriate in common fund case where pool of money is to be divided among class members).

The First Circuit noted additionally that the percentage-of-fund approach promotes more efficient use of attorney time because it is result-oriented.  In contrast, the lodestar method, which is linked to time spent in obtaining a result, creates a disincentive for early settlement of cases and rewards unproductive behavior.  *Thirteen Appeals*, 56 F.3d at 307 ("For another thing, using the POF method in a common fund case enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency.").  Finally, the percentage method better reflects the market value of counsel's services than the lodestar approach:

> [B]ecause the POF technique is result-oriented rather than process-oriented, it better approximates the workings of the marketplace.  We think that Judge Posner captured the essence of this point when he wrote that "the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character." . . . [T]he market pays for the result achieved.

*Id.* (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992)); *In re Sequoia Sys., Inc. Sec. Litig.*, No. 92-11431-WD, 1993 WL 616694, at *2 (D. Mass. Sept. 10, 1993) (percentage fee awards "ensure that those who are engaged in the plaintiff's side of securities litigation are not unduly discouraged from prompt resolution of these cases and full pursuit of the claims of plaintiffs

who, absent such counsel, would be unlikely to have any vindication of the rights that they have in this setting.").

C.   **Attorneys' Fees in the Amount of Thirty Percent Are Reasonable When Considered Under the Applicable *Johnson* Factors**

Although the First Circuit has not specifically determined what approach district courts must follow in evaluating whether a given percentage fee is reasonable, "[t]he majority of Circuits review percentage-of-funds fee awards by using multifactor tests in which the district courts must examine and set forth findings on each factor." *Nilsen*, 400 F. Supp. 2d at 273.  The First Circuit has "embraced," if not formally adopted, the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), "for use in sculpting fee awards." *Coutin v. Young & Rubicam P.R.*, 124 F.3d 331, 337 n.3 (1st Cir. 1997) (citing *Johnson*, 488 F.2d at 717-19 and *Segal v. Gilbert Color Sys., Inc.*, 746 F.2d 78, 86 (1st Cir. 1984)).  The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney(s) due to acceptance of the case; (5) the customary fee; (6) the nature of the fee (fixed or contingent); (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney(s); (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) the size of awards in similar cases.

*Coutin*, 124 F.3d at 337 n.3.[4]  Each of the relevant factors supports the requested thirty percent attorneys' fee.[5]

---

[4]   Because factors 4, 7, 10, and 11 are of minimal relevance to this motion, and do not weigh against the requested fee, they are not discussed here.  *See In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 993 (D. Minn. 2005) ("Plainly, not all of the individual *Johnson* factors will apply in every case, so the court has wide discretion as to which factors to apply and the relative weight to assign to each.").

[5]   Lead Plaintiffs support the requested attorneys' fee.  The Evergreen Investor Group and the Bricklayers Group discussed the requested attorneys' fee with their counsel and they support such an

### 1.      The Time and Labor Required

The proposed Settlement is the product of considerable time and labor expended by Lead Counsel.  As described in detail in Sections II, III and IV of the Joint Declaration, the amount of time and effort required, given the unique factual and evolving legal framework of the case, over the course of approximately four years, was substantial.

Once appointed, Lead Counsel undertook a comprehensive review and analysis of the Fund's multiple prospectuses, registration statements, statements of additional information, shareholder updates, periodic reports, and other SEC filings and public disclosures, spanning many thousands of pages and covering approximately three years.  Lead Counsel also worked closely with their investigators to locate and interview witnesses who had first-hand knowledge about the business and operations of the Evergreen entities and the operation of the Fund. They utilized this and other information, and their legal research, to craft the contours of the case and draft the First Amended Class Action Complaint ("Complaint").

The parties then engaged in motion to dismiss briefing.  Dkt Nos. 37-39, 42, 43.  The issues argued were numerous, difficult, and sometimes novel.  Lead Counsel then prepared for and conducted oral argument, at the conclusion of which the Court granted Defendants' motion as to certain Defendants, but ultimately upheld the Complaint in its entirety.  Dkt. No. 46.  Thereafter, the parties engaged in full document and deposition discovery directed to class, merits and expert issues. Lead Plaintiffs' Counsel drafted numerous document and discovery requests which resulted in the

---

award.  Indeed, many courts hold that such an agreement is entitled to a "presumption of reasonableness."  *See In re Cendent Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) ("[t]his presumption will ensure that the lead plaintiff, not the court, functions as the class's primary agent vis-à-vis its lawyers"); *In re Qwest Commc'ns Int'l, Inc.*, 625 F. Supp. 2d 1143, 1151 (D. Colo. 2009) (presumption carries significant weight).

production of approximately 1.1 million pages of documents that were reviewed and analyzed in anticipation of fact and expert depositions, and a motion for class certification.  Ultimately, the parties conducted 15 fact depositions, six expert depositions, and the depositions of five Lead Plaintiffs.

On February 15, 2011, Lead Plaintiffs moved for class certification.  Dkt. No. 66.  Briefing was completed on May 16, 2011 and, on August 10, 2011, the Court granted Lead Plaintiffs' class certification motion in its entirety.  Dkt. No. 73.  A scheduling order setting dates for pretrial/trial motions including motions *in limine*, oppositions thereto, exhibit and witness lists, proposed verdict forms, proposed jury instructions and proposed *voir dire* was electronically entered on January 31, 2012.  Defendants thereafter moved for partial summary judgment [Dkt. Nos. 77-82], which Lead Plaintiffs opposed on March 15, 2012.  Dkt. Nos. 87-90.

Meanwhile, Lead Plaintiffs prepared a motion to approve providing notice to the class of the pendency of the Litigation and to approve Lead Plaintiffs' selected claims administrator, Heffler Claims Administration, the notice procedures to be used.  Dkt. No. 84.  The Court entered an order approving Lead Plaintiffs' motion on March 9, 2012.  Dkt. No. 85.

In June 2011, the parties agreed to explore the possibility of settlement through mediation. Lead Counsel then worked closely with their damages expert to analyze Evergreen's internal data and the resulting damage scenarios, they reviewed and analyzed the documents produced by Defendants, researched legal issues concerning certain defenses, and drafted a comprehensive mediation statement.  They then attended a full-day mediation session at defense counsel's offices in New York City, on August 31, 2011.  The parties were unable to reach agreement at that time but agreed to an exchange of additional information and convened for a second mediation, which was held on October 21, 2011 in one of Lead Counsel's offices in Florida.  Despite good faith efforts, a

settlement could not be reached.  As the parties were actively preparing for trial, and following Defendants' withdrawal of their motion for partial summary judgment, the parties recommenced further settlement dialogue.  That dialogue took several weeks and ultimately culminated in the Settlement.

Lead Plaintiffs' Counsel then worked diligently in drafting and finalizing the lengthy Stipulation of Settlement, proposed notices to the Class, proposed orders, a motion for preliminary approval, and the numerous papers submitted in support of final approval.  They have also responded to numerous Class Member inquiries regarding the settlement process and the submission of shareholder claims.

The time spent by Lead Plaintiffs' Counsel reflects the substantial effort entailed in bringing this difficult action to a successful conclusion in the face of an evolving legal landscape.  Lead Plaintiffs' Counsel spent 7,039.10 hours litigating this action and achieving the Settlement, resulting in a combined lodestar of $4,601,270.00.  *See* Joint Decl. §V and Exs. C-G.  Lead Counsel submit that their time and effort amply supports the requested fee award.

### 2.        The Novelty and Difficulty of the Questions

Securities class actions are well-recognized for their complexity and difficulty.  *See, e.g., In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) ("[F]ederal courts . . . 'have long recognized that [securities class action] litigation "is notably difficult and notoriously uncertain."'") (citations omitted).  Further, courts have properly recognized that "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA."  *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000).  This case is no exception.  Lead Plaintiffs faced obstacles both at the motion to dismiss stage and at class certification.  In particular, Lead Plaintiffs faced difficult issues relating to the misleading nature of the statements in Defendants' Offering Materials and questions regarding whether loss causation could be determined because the Fund was a mutual

fund (as opposed to an individual security) whose shares price, Defendants argued, should be determined by the aggregate value of the underlying assets in the Fund's portfolio (*i.e.*, its NAV), which is calculated in accordance with statutory formulas contained in the Investment Company Act. At class certification, Lead Plaintiffs vigorously (and successfully) defended against Defendants' claims that Lead Plaintiffs were atypical of the Class they sought to represent and that they did not have standing throughout the Class Period.  Given the difficulties presented and overcome through this outstanding settlement, the fee requested is reasonable.

> **3.     The Skill Required to Perform the Legal Services Properly and the Ability of the Attorneys**

The monetary benefits obtained for Class Members from the settlement of the Litigation were due in large part to the high-caliber of representation they received from Lead Plaintiffs' Counsel. The expertise and experience of Lead Plaintiffs' Counsel is described in the declarations and firm resumes submitted herewith.  Lead Plaintiffs' Counsel are among the most experienced and skilled practitioners in the securities class action field, and have long and successful track records in such cases.  Their willingness and ability to take complex and difficult cases such as this to trial added valuable leverage in the settlement negotiations.[6]

---

[6]     The quality of the work performed by Lead Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. *See Xcel*, 364 F. Supp. 2d at 995 ("Defendants' attorneys . . . consistently put plaintiffs' counsel through the paces. All counsel consistently demonstrated considerable skill and cooperation to bring this matter to an amicable conclusion.").  Defendants are represented by, among others, Reed Smith LLP and Ropes & Gray LLP.  These highly experienced and skilled attorneys spared no effort in the defense of their clients. In the face of this knowledgeable, formidable, and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Litigation on terms that were favorable to the Class. *See also In re Charter Commc'ns, Inc. Sec. Litig.*, No. MDL 1506, 2005 WL 4045741, at *17 (E.D. Mo. June 30, 2005) ("it is reasonable for Lead Counsel and the other plaintiffs' firms be as well paid as their adversaries who did not work on a contingency basis").

### 4.    The Customary Fee and the Size of Awards in Similar Cases

A reasonable percentage fee generally should emulate what counsel would receive had they been bargaining for services in the marketplace.  *See Missouri v. Jenkins*, 491 U.S. 274, 285 (1989), *Thirteen Appeals*, 56 F.3d at 307.  If this were a non-representative litigation, the customary fee arrangement would similarly be contingent, on a percentage basis, and in the range of one-third of the recovery.  *See Blum*, 465 U.S. at 903 ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery.").

A thirty percent fee sought here is comparable to the percentages awarded by other courts in this Circuit in common fund cases, and it is merited in light of the effort required, the significant risks involved, and the result obtained.  *See, e.g., In re Indigo Sec. Litig.*, 995 F. Supp. 233, 235 (D. Mass. 1998) (awarding attorneys' fees in the amount of 30% of the gross settlement fund); *Relafen*, 231 F.R.D. at 82 (concluding 30% of fund fee is not unreasonable as a matter of law); *Bennett v. Roark Capital Grp., Inc.*, No. 2:09-cv-00421-GZS, 2011 WL 1703447, at *2 (D. Me. May 4, 2011) (holding class counsel entitled to the "customary" 30% fee); *In re StockerYale, Inc. Sec. Litig.*, No. 1:05cv00177-SM, 2007 WL 4589772, at *6 (D.N.H. Dec. 18, 2007) (awarding lead plaintiffs' counsel 33% of the gross settlement fund as fair and reasonable).[7]

### 5.    The Contingent Nature of the Fee and the Risk of Nonpayment

"Many cases recognize that the risk assumed by an attorney is 'perhaps the foremost factor' in determining an appropriate fee award."  *In re Lupron(R) Mktg. & Sales Practices Litig.*, No. MDL

---

[7]    *See also In re Eaton Vance Corp. Sec. Litig.*, No. 01 CV 10911 EFH, slip op. (D. Mass. Apr. 26, 2006) (30%); *Deckler v. Ionics, Inc.*, No. 03-CV-10393-WGY, slip op. (D. Mass. Apr. 4, 2005) (30%), attached as Exhibit B to the accompanying Joint Declaration.

1430, 2005 WL 2006833, at *4 (D. Mass. Aug. 17, 2005) (quoting *Goldberger*, 209 F.3d at 54).

This risk encompasses not only the risk of zero payment, but also the risk of underpayment.  *See*

*Cont'l Ill.*, 962 F.2d at 569-70.

 The Litigation here was undertaken by Lead Plaintiffs' Counsel entirely on a contingent-fee

basis.  The risks assumed by Lead Plaintiffs' Counsel in bringing these claims to a successful

conclusion are described in the Joint Declaration and the settlement brief.  From the outset, Lead

Plaintiffs' Counsel understood that they were embarking on a complex, expensive and lengthy

litigation with no guarantee of ever being compensated for the substantial investment of time and

money the case would require.  In undertaking that responsibility, Lead Plaintiffs' Counsel were

obligated to ensure that sufficient resources were dedicated to the prosecution of the Litigation,

including payment of the considerable out-of-pocket costs that a case such as this requires.  With an

average lag time of more than three years for these types of cases to conclude, the financial burden

on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  In fact, Lead

Plaintiffs' Counsel have received no compensation whatsoever during the over four-year course of

the Litigation, while they have incurred $798,277.56 in expenses.

 Lead Plaintiffs' Counsel also bore the very real risk that no recovery would be achieved.  *See*

*Relafen*, 231 F.R.D. at 80 (adopting counsel's argument that "'Class Counsel alone bore the risk of

the case being dismissed at the pretrial stage, of not prevailing at trial, or even losing on appeal'")

(citation omitted).  From the outset, this case presented a number of risks, uncertainties and unsettled

legal issues that could have prevented any recovery whatsoever.  That risk was magnified by the

SEC Settlement, and that a significant part of the Class had already received compensation pursuant

to the SEC Settlement.  Nevertheless, Lead Plaintiffs' Counsel expended a substantial amount of

time and spent significant resources in this case despite the risk that the case would not even survive the motion to dismiss, let alone class certification.

Despite the most vigorous and competent of efforts, success in contingent-fee litigation such as this is never assured. Tens of thousands of hours have been expended in losing efforts. Lead Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels. There have been many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, that excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. *See Lupron*, 2005 WL 2006833, at *4 ("History is replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages.") (collecting cases); *see also Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001) (affirming summary judgment in favor of defendants in securities fraud case).

Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel seek recompense for investors defrauded by corporations' and corporate officers' violations of the securities laws and regulations. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 n.4 (2007) ("'private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses' – a matter crucial to the integrity of domestic capital markets.") (citation omitted). In addition, Congress has recognized through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs take an active role in protecting the interests of shareholders. If this important public

policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

### 6.      The Amount Involved and the Results Obtained

Courts have consistently recognized that the result achieved is one of the most important factors to be considered in making a fee award.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained").  The Settlement Fund of $25 million has been obtained through the diligent efforts of Lead Plaintiffs' Counsel without the necessity and risk of prolonged litigation, trial and appeals.  The favorable nature of this settlement is supported by a review of recoveries in other securities class action settlements.  Setting aside the fact that actual provable damages could end up to be a fraction of Lead Plaintiffs' preliminary damage analysis had the case moved forward through trial, a recent study by National Economic Research Associates states that in 2003, the median percentage of investor losses recovered in shareholder class action settlements was 2.8%, up from 2.7% in 2002.  *See* Elaine Buckberg, Todd Foster, and Stephanie Plancich, *Recent Trends in Securities Class Action Litigation: 2003 Early Update*, at 8 (NERA Feb. 2004).  The present settlement represents nearly 26% percent of damages assuming complete success on all liability and damage theories for the entire Class.[8]  When measured against the results in comparable cases, and taking into account the serious disputes between the parties as to materiality, loss causation, and damages, Lead Plaintiffs' Counsel achieved a tremendous recovery for Class Members.

---

[8]      This does not include any reductions for the monies Class Members received pursuant to the SEC Settlement.  When damages are reduced by amounts already received by Class Members from the SEC Settlement, the $25 million recovery represents 37% of the estimated recoverable damages. When the recovery in this case is combined with the SEC settlement, Class Members will receive approximately 56% of recoverable damages, an excellent recovery by any measure.

Given all the above, there is no doubt Lead Counsel achieved a favorable recovery for Class

Members in this case and should be awarded the 30% fee requested to compensate them for such an

outstanding result.

Thus, this factor and indeed all of the pertinent *Johnson* factors discussed above support the

requested attorneys' fees.[9]

### 7. The Requested Attorneys' Fees Are Reasonable When Cross-Checked Against Plaintiff's Counsel's Lodestar

The Court is not required to cross-check the requested thirty percent fee against Plaintiff's

Counsel's lodestar in determining whether the requested fee is reasonable.  *See Relafen*, 231 F.R.D.

at 81 (citing *Thirteen Appeals*, 56 F.3d at 307).   Nevertheless, when a lodestar cross-check is

employed, the focus is not on the "'necessity and reasonableness of every hour'" of the lodestar, but

rather on the broader question of whether the requested fee appropriately reflects the degree of time

and effort expended by counsel.  *Tyco*, 535 F. Supp. 2d at 270 (quoting *Thirteen Appeals*, 56 F.3d at

307); *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005).  The Supreme Court

has indicated that the use of current, rather than historical, billing rates is appropriate in examining

the lodestar because current rates more adequately compensate for inflation and loss of use of funds.

*See Jenkins*, 491 U.S. at 283-84.

Here, Lead Plaintiffs' Counsel collectively devoted 7,039.10 hours to the prosecution and

settlement of the Litigation as of the date hereof, resulting in a total lodestar of $4,601,270.00.  This

lodestar yields a multiplier of 1.6 when compared to the thirty percent request.  Given the number of

---

[9]      The reaction of the Class to the requested fee, while not one of the formal *Johnson* factors, is also relevant.  *See Relafen*, 231 F.R.D. at 79-80 ("examin[ing] and carefully consider[ing] each of the objections" to the requested fee); *Tyco*, 535 F. Supp. 2d at 269 (considering number and merits of objections to fee request).  To date, there have been no objections to Lead Counsel's request for attorneys' fees or expenses.

hours invested by counsel at competitive rates, the risks undertaken and the results achieved, this 1.6 multiplier is reasonable and in the range of multipliers found reasonable for "cross-check" purposes in common fund cases in this Circuit. *See In re Fidelity/Micron Sec. Litig.*, No. Civ.A. 95-12676-RGS, 1998 WL 313735, at *4 n.11 (D. Mass. June 5, 1998) (while action settled before discovery and requested fee would result in multiplier, "counsel should not be unduly penalized for promptly resolving litigation that could easily have been protracted"), *vacated on other grounds*, 167 F.3d 735 (1st Cir. 1999); *Tyco*, 535 F. Supp. 2d at 271 (finding multiplier of 2.697, on fee of 14.5% of $3.2 billion settlement, "relatively low" and "appropriately compensates counsel for the risk that they assumed in litigating the case"); *Relafen*, 231 F.R.D. at 82 (finding multiplier of 2.02 on fee of 33-1/3% "appropriate" without extended discussion).

In sum, Lead Counsel respectfully submit that a lodestar cross-check further supports the requested thirty-percent fee.

### 8. The Expenses Were Reasonably and Necessarily Incurred by Plaintiff's Counsel

Lead Counsel also request an award of expenses incurred in connection with the Litigation. Attorneys who create a common fund for the benefit of a class are entitled to payment of reasonable litigation expenses from the fund. *See In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) ("[L]aw firms are not eleemosynary institutions, and lawyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax."). In the Notice, the Class was advised that "Lead Plaintiff's Counsel will ask the Court for expenses not to exceed $950,000.00 to be paid out of the Gross Settlement Fund."

The appropriate analysis to apply in deciding which expenses are compensable in a common fund case of this type is whether the particular costs are of the type typically billed by attorneys to paying clients in the marketplace. *See, e.g., New Eng. Health Care Employees Pension Fund. v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 635 (W.D. Ky. 2006). The categories of expenses for which counsel seek payment here are the type of expenses routinely charged to hourly clients and, therefore, should be paid out of the common fund.

Lead Counsel respectfully seek an award of litigation expenses in the amount of $798,277.56. The declarations of Lead Plaintiffs' Counsel and Liaison Counsel, attached as Exhibits C-G to the Joint Declaration, provide itemized schedules of the expenses incurred. A significant component of Lead Plaintiffs' Counsels' expenses is the cost of experts, consultants, and investigators. These personnel were crucial to the successful prosecution and resolution of the Litigation. For instance, in the post-PSLRA era (and now the post-*Ashcroft v. Iqbal* era), the use of investigators to gather fact-specific information from percipient witnesses in order meet the relevant pleading standards is often a necessity. Similarly, the retention of a damages expert, with significant experience opining on damages in a §§11 and 12 class action such as this, was essential to understanding the wide-ranging scenarios and issues relative to estimating recoverable damages and analyzing Evergreen's internal data related to such calculations. Moreover, the retention of liability experts was crucial to demonstrating the material misrepresentations that were at the heart of the case.

Other noteworthy expenditures were related to travel for attending hearings, depositions, preliminary settlement meetings, several formal mediation sessions, and, meetings with Lead Plaintiffs. Additional expenses related to mediation services, court fees, transcripts, photocopies, delivery services, long distance and facsimile charges, computer assisted research (both legal and

factual), maintenance of an electronic discovery database, and publication of PSLRA notices of filing.

Lead Plaintiffs' Counsel submit that these expenses were reasonably and necessarily incurred in prosecuting the Litigation and should be awarded from the Settlement Fund.

### D.     Lead Plaintiffs Are Entitled to Payment for Their Reasonable Time and Expenses Pursuant to 15 U.S.C. §77z-1(a)(4)

The Class was also advised that each Lead Plaintiff would also ask the Court for an award of expenses incurred "not to exceed $20,000" in connection with their participation in the Litigation. Such awards are permitted by the PSLRA. *See* 15 U.S.C. §77z-1(a)(4) ("Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class.").

The reason behind permitting reimbursement for services of a lead plaintiff was made clear in the congressional record:  "These provisions are intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel."    H.R. Conf. Rep. No. 104-369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, at 731 (1995).[10]  Accordingly, courts frequently avail themselves of the discretion provided under the PSLRA to grant remuneration to lead plaintiffs.  *See, e.g., In re Marsh & McLennan Cos. Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *21 (S.D.N.Y. Dec.

---

[10]     Furthermore, the Court should consider not only the effort of the Lead Plaintiffs in pursuing claims, but also the important policy grounds of fostering the enforcement of the federal securities laws and rewarding a representative plaintiff who has been instrumental in obtaining recoveries on behalf of other similarly situated shareholders.  If there were no individual shareholders willing to step forward and pursue a claim on behalf of fellow investors, countless violations of law would go unprosecuted and unpunished.

23, 2009) (awarding $144,657 to the New Jersey Attorney General's Office and $70,000 to the Ohio Funds, which was requested "to compensate them for their reasonable costs and expenses incurred in managing this litigation and representing the Class").

Lead Counsel respectfully submits that the Court should do the same here and approve the Evergreen Investor Group and the Bricklayers Group's request for such awards. *See* accompanying Declarations of Lead Plaintiffs in Support of Application for Award to Representative Plaintiffs Pursuant to 15 U.S.C. §77z-1(a)(4) ("Lead Plaintiffs' Declaration") (setting forth calculation of the requested amount). The Evergreen Investor Group and the Bricklayers Group have fully discharged their PSLRA obligations and were actively involved in the Litigation. They worked closely with counsel throughout the case, they communicated with counsel on a regular basis, reviewed and provided input with respect to counsel's submissions, provided information, produced documents, and participated in settlement discussions. The Evergreen Investor Group and the Bricklayers Group are seeking reimbursement of their time as documented in Lead Plaintiffs' Declarations.

Without question, by faithfully undertaking their duties as lead plaintiffs, the Evergreen Investor Group and the Bricklayers Group have effectuated the policies underlying the federal securities laws. For these reasons, as detailed in Lead Plaintiffs' Declaration, the Court should grant the requested awards.

## III.   CONCLUSION

Lead Counsel respectfully requests that the Court approve and enter an order: (1) awarding attorneys' fees in the amount of thirty percent (30%) of the Settlement Fund ($7,500,000); (2) awarding Plaintiff's Counsel $798,277.56 in expenses; (3) reimbursing Lead Plaintiffs for their time and expenses incurred in connection with the Litigation; and (4) awarding interest on these amounts at the same rate and for the same periods as earned by the Settlement Fund until paid.

DATED:  October 22, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE


_____s/ JACK REISE_____


120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com

COHEN, PLACITELLA & ROTH, P.C.
STEWART L. COHEN
MICHAEL COREN
STUART J. GUBER
Two Commerce Square, Suite 2900
2001 Market Street
Philadelphia, PA  19103
Telephone:  215/567-3500
215/567-6019 (fax)
scohen@cprlaw.com

EVANGELISTA & ASSOCIATES, LLC
JAMES M. EVANGELISTA
400 Colony Square
1201 Peachtree Street, NE
Atlanta, GA  30361
Telephone:  404/961-7650
404/961-7651 (fax)
jme@eafirm.com

***Co-Lead Counsel for Plaintiffs***

RIGRODSKY & LONG, P.A.
TIMOTHY J. MACFALL
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone:  516/683-3516
tjm@rigrodskylong.com

MARINO & CONROY LLC
STEVEN F. MARINO
301 Wharton Street
Philadelphia, PA  19147
Telephone:  215/462-3200
215/462-4763 (fax)

***Additional Counsel for Plaintiff***

PYLE ROME EHRENBERG PC
BETSY EHRENBERG, BBO #554628
18 Tremont Street, Suite 500
Boston, MA  92108
Telephone:  617/367-7200
617/367-4820 (fax)
behrenberg@pylerome.com

***Liaison Counsel***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 22, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

_____s/JACK REISE_____